THE BALTIMORE AND OHIO R. CO. *vs.* STATE, Use of LYDIA A. HENDRICKS et al.

*Negligence—Collision at Railway Crossing—Neglect to Lower Safety Gates—Contributory Negligence—Failure to Look or Listen for Train—Prayer Assuming Facts—Evidence—Appeal.*

The tracks of an electric street railway crossed at grade three tracks o the defendant steam railroad company. At this crossing safety gates were placed and a watchman stationed whose duty it was to lower the gates upon the approach of a train, but the regulation of the electric company also required its cars to stop and its conductors to go upon the railroad tracks to look for trains before crossing. After dark on the evening of the accident involved in this case an electric street car came to the railroad from the south and stopped 15 feet south of the track. The safety gates were up and the watchman standing nearby. The conductor of the car went on foot to the middle track and looked in both directions, east and west. He saw no train and heard no bell, and then directed the motorman to come forward. When the car reached the middle track, it was struck by a locomotive coming from the west at a speed of about eight miles an hour and the motorman

was killed by the collision.   There was a curve in the railroad tracks near the crossing so that the direct view of the conductor when on the middle track was only about 250 feet to ·the west, and the view of the motorman in that direction from the point where his car stopped was partly cut off by the watch-box and he could see only about 75 feet. The evidence on the part of the plaintiff, in this action to recover damages for the death of the motorman. was that the headlight of the locomotive was not lit ; that no bell was rung; that the motorman could not have seen the engine until it was within thirty yards of the crossing, and that he could not then have stopped his car in time to avoid the accident.   The defendant's evidence was that the headlight of the locomotive was lit and the bell rung and that the engineman did not see the street car until it was too near to avoid the collision; also that a passenger in the car saw the engine in time and jumped out of the car before it was struck.   *Held*, that the Court cannot rule as matter of law that the motorman was guilty of contributory negligence on account of his failure to look or listen for the approaching train or to see or hear it if he did look and listen, since the evidence shows that neither the conductor nor the watchman, although looking, saw or heard, and the physical conditions which existed, such as the absence of a headlight, the omission to ring the bell, the sharp curve in the track, the situation of the watch-box and the speed of the engine rendered it possible that the motorman did not see or hear the train when he started his car forward.

*Held*, further, that in passing upon the defendant's prayer withdrawing the case from the jury on account of the motorman's contributory negligence, the truth of the plaintiff's evidence must be assumed, and the act relied on to establish, as matter of law, the existence of contributory negligence· must be distinct, prominent and decisive and one about which ordinary minds would not differ in declaring it to be negligent.

When the question is whether a party is guilty of contributory negligence because he did not look for or did not see a dangerous thing, then if that party says that he did look but did not see the object, and the circumstances are such that if he had really looked he must have seen it, his testimony cannot be credited.   But that conclusion is not to be adopted when the circumstances of the case are such that it was possible for him to look and still not see the object.

There is a broad difference between not seeing an object because one does not look and not seeing it although one does look.   In the first instance a failure to look, when the duty to look is imperative, is an act of negligence, whereas in the other instance a failure to see when one does look may be due to other causes than carelessness.

If a person crossing a railroad track where there are safety gates knows that the open gates are not to be depended upon as an assurance that the track is clear and nevertheless does depend upon them and fails to observe the precautions that would be requisite if there were no safety gates, he is guilty of negligence.

In an action to recover damages for the death of the motorman of an electric car caused by a collision at a railroad crossing when the safety gates were not lowered as they should have been, it is competent for the defendant railroad company to call the attention of the jury to the rule of the electric company by which its conductors and motormen were instructed not to rely on the position of the safety gates before crossing the track.

A prayer is defective if it either expressly or inferentially assumes as proved a fact which should be submitted to the jury for them to find, especially when the burden of proving that fact is upon the party presenting the prayer.

In an action to recover damages for the death of a party at a railroad crossing by collision with a train, a prayer instructing the jury that it was the duty of the deceased to look and listen while crossing the track and if the jury find that the accident would not have occurred if the deceased had so looked and listened then no recovery can be had, is defective, because it assumes that the deceased did not look or listen and does not require the jury to find that fact.

For the same reason a prayer is defective in such action which instructs the jury that it was the duty of the deceased in crossing the track to exercise reasonable care to avoid collision, and if the jury find that the failure of the deceased to exercise such reasonable care directly contributed to cause the accident, then their verdict must be for the defendant. Such prayer assumes as a fact that the deceased did fail to use reasonable care and does not leave that inquiry to the jury as a distinct question.

The Court of Appeals cannot consider what influence the rejection of one prayer aud the granting of another in the presence of the jury may have had upon their verdict. The jury must be presumed to have acted on the law of the case as laid down in the instructions given, irrespective of the rejected prayers on either side.

In an action to recover damages for an injury by collision at a railway crossing when the safety gates were not lowered at the time the person injured went upon the track, evidence is admissible to show that a statute or municipal ordinance required that safety gates should be operated at that crossing.

*Decided June 16th, 1906.*

Appeal from the Court of Common Pleas (DOBLER, J.), where there was a verdict and judgment for the equitable plaintiffs for $4,000.

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Duncan K. Brent* (with whom was *W. Irvine Cross* on the brief), for the appellant.

*Thos. Ireland Elliott,* for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

This is a personal injury case in which the injury resulted in the death of the husband and father of the equitable plaintiffs. There are two exceptions in the record, both taken by the defendant. The first relates to a ruling on the admissibility of evidence and the second concerns the action of the trial Court on the various prayers for instructions to the jury. The facts which the record contains are in the main conflicting and it will be necessary to state both views of them somewhat in detail inasmuch as the inquiries depending upon them involve questions of negligence and contributing negligence.

Philip T. Hendricks, the deceased, was at the time the accident happened which caused his death, and for eight and a half years prior thereto had been a motorman on the John street line of the United Railways and Electric Company of Baltimore. The double tracks of the electric railway intersect three tracks of the Baltimore and Ohio Railroad on Ridgely street in the city of Baltimore. For more than two years the deceased had run his cars across the railroad tracks at that point some twenty times each day. At the intersection of Ridgely street and the Baltimore and Ohio's right of way there are safety gates which were erected by the railroad company in obedience to the requirements of *sec. 791* of the City Charter. That section provides that the safety gates shall be closed on the approach of any and every train of cars or locomotives and shall be kept closed until the cars or locomotives have completely passed the street crossing. To the introduction in evidence of that section of the charter the railroad company objected and to the refusal of the Court to exclude it the first exception was taken. We see no error in that ruling and its correctness was not questioned at the argument in this Court. There will be no occasion to allude to it again.

On the evening of December the twenty-seventh, 1902, electric car No. 1230, of which the deceased was motorman and John F. Towles was conductor, left its Westport terminus at 5:19 and started northward towards the city. At 5:26 it reached the Ridgely street crossing and stopped about fifteen feet south of the railroad tracks. The conductor left the car and went forward on foot to the centre of the middle or east-bound track of the railroad and looked twice in both directions—east and west—along the railroad tracks to see whether any trains or locomotives were approaching. He saw no train or locomotive and he heard no bell, of this he was positive. The safety gates were raised when the electric car reached the point where it stopped south of the crossing and the watchman was standing in front of his watch-box which was located about four feet distant from and south of the siding that constitutes the southernmost of the three railroad tracks which cross Ridgely street. When the conductor, standing in the centre of the middle railroad track, saw and heard no train approaching—having gone there for the express purpose of ascertaining whether it would be safe for the electric car to cross—he motioned to the motorman to come forward. As the motorman started the electric car forward the conductor retraced his steps towards the car and just as he seized the hand-hold at its rear the electric car was struck by a ninety-eight ton engine of the Baltimore and Ohio Company which was going at the rate of about eight miles an hour towards Camden Station on the east-bound or middle railroad track, and the electric car was shattered and the motorman was found on the pilot of the locomotive seriously injured, from which injuries he died at the City Hospital three days later.

This suit was later on brought in the name of the State for the use of the widow and infant children of the motorman against the electric railway and the Baltimore and Ohio Railroad Company. It was abandoned as to the electric railway but proceeded to trial against the railroad company and from a judgment recovered against the latter this appeal was taken. In the discussion which will follow the United Railways and

Electric Company will, for brevity, be spoken of as the electric railway, and the Baltimore and Ohio Railroad will, for the same reason, be described as the railroad company.

In addition to the facts which have just been stated it appeared by the testimony of a witness named Buck that he was standing at the Ridgely street crossing immediately before the collision, waiting for a street car; that when Towles' car stopped on the south side of the crossing witness got on the rear platform; that the safety gates were up; that the conductor jumped off the car and ran past the witness towards the front of the car on the right hand, or eastern side; that the car started within a second or so after the witness got on it; that while he was just about to go into the car, a passenger inside the car jumped up and ran past the witness and jumped off the car, and then the car started to go across the tracks, and it had only gone a few feet when it was struck by the locomotive, and switched around, and the witness was thrown in the street; that at this time the witness was standing on the back platform with his hands on each side of the door jamb; that during the time he was standing on the sidewalk and before he got upon the car he did not hear any bell ring, and as he is not hard of hearing he should have been able to hear it had it rung; that from the place where he was standing waiting for the car to come, right opposite the B. & O. watchbox, he could not see down the track in the direction from which the train came more than one hundred feet; that there is a decided curve in the track there at that point; that he did not see any engine on the tracks of the B. & O. railroad approaching the Ridgely street crossing, though he was not looking in that direction, and that he did not hear any whistle or bell ringing; that when the electric car started it went slowly. The same witness further testified that as he was about to go into the car he looked through the left-hand side of the car and saw two small lights approaching near the ground which he thought was some dark looking object; though he could not tell what it was, he thought it was the rear end of a train. When he first saw these lights they were about 30 or 40 feet

away, and were approaching.    It was proved by the railroad
watchman that his watch-box had no signal bell and the only
way he could tell of the approach of an engine was by watch-
ing and listening for it; that though he was watching and
listening he neither saw nor heard the approach of the loco-
motive until it was within thirty yards of the crossing; that
its headlight was not lit, that no bell was rung and that the
time intervening between his seeing the engine and the occur-
rence of the collision was too brief to enable him to lower
the safety gates; and that the locomotive after striking the
electric car ran a distance of seventy-five or a hundred yards
before it was checked.    The same witness also testified that
he did not think the motorman had time to stop his car and
avoid the collision, even if he had seen the engine when it was
thirty yards distant.

On the part of the railroad company there was evidence
offered tending to prove that the headlight of the locomotive
was lit and that the bell was rung; that the engineman did not
see the electric car until his engine was within 75 feet of the
crossing, a distance too short within which to avoid the acci-
dent.    It was proved in behalf of the defendant by Henry
Myers that he was a passenger in the street car at the time of
the accident.    "But a little before the accident occurred I was
sitting in the car on the right hand side of the car going in
towards the city.    As we arrived at the crossing I saw the
engine coming, and I thought we might be in an accident and
I got out of the car, and I had no more than gotten out of
the car when the collision occurred."    That when he got out,
the car was moving, and had started to go across the tracks,
that before this it merely stopped, and went right on.    He
was asked "how long do you suppose the stoppage took
place?" and he answered: "Well that I couldn't have no idea
about.    You see I was watching the engine approaching and
I didn't notice how long the car stopped or anything like
that."    "How far away was the engine at that time?"    "Well,
I judge the engine must have been fifty feet off, or something
like that."    The defendant proved by Beale Cook that he was

a passenger in the street car at the time of the accident; that when the car got to Ridgely street it stopped "and the conductor gets off and walks around the back end of the car, the rear end of the car, around this side, the left or west side, to about the fourth window, or to about the third or fourth window from the after end of the car—the conductor said to the motorman go ahead, and in that time there was some talk of an approaching engine, or something approaching.    I don't know what it was, and in that time the conductor said to him to go ahead.    Quick, quick, quick, motioning in that direction, standing in the middle of the two United Railway tracks, and in that moment he said jump.    And in that time the crash was struck.    And at the time it struck there was a gong struck, but I couldn't say positively whether it was the engine or not, but I heard the bell at the time."    He further testified that time which elapsed between the order of the conductor to the motorman to go ahead and the direction to jump was just sufficient to enable the electric car to run into the locomotive, which the witness thought was the way the collision occurred.    It was further shown that the distance from where the electric car stopped upon its arrival at the crossing, to the point where the conductor stated he had gone to look up and down the tracks was thirty-eight feet.    There is a fence across Scott street which is the next street west of Ridgely street and from Bayard street, which is still further west than Scott street, there is a decided curve in the railroad tracks.    A person standing where the conductor stood could by looking along the chord of the arc described by the curve and by looking over the top of the fence across Scott street see a distance of five hundred feet; but by looking down the tracks along the periphery of the curve his range of vision would not extend beyond two hundred and fifty feet, if the plat filed in the case accurately locates the railroad.    The watch-box at the crossing cut off the view of the motorman westwardly and he could see from the point where his car stopped only to a point seventy-five feet west of the spot from which the conductor looked up and down the tracks.

It was proved without contradiction on the cross-examination by the defendant of the conductor of the electric car that he, the conductor, was always careful and looked out for trains and took every precaution; "that it was a rule of the United Railways and Electric Company that every car should stop at this crossing and it was in accordance with his custom and the rule of the company to get off and go out and look for trains, and that he thinks that was an important precaution."

Upon this state of facts the railway company asked instructions withdrawing the case from the jury on the ground that the deceased had been guilty of contributory negligence which directly caused his death. The prayers asking that instruction were refused and that refusal is one of the errors assigned on this appeal in the second bill of exceptions.

It is not pretended, and could not well be in view of some of the evidence to which allusion has been made, that the railroad company was free from negligence on the occasion of this unfortunate occurrence; but do the facts justify the Court in ruling as a matter of law that a recovery cannot be had because the deceased was himself guilty of contributing negligence ? In dealing with such a question the truth of the evidence adduced by the plaintiff must be assumed and all legitimate inference deducible from that evidence must be conceded. The act relied on to establish, as a matter of law, the existence of contributory negligence must be distinct, prominent and decisive, and one about which ordinary minds would not differ in declaring it to be negligent. Where the nature and attributes of an act relied on to show negligence contributing to an injury sustained can only be determined correctly by considering all the attending and surrounding circumstances of the transaction, it falls within the province of the jury to pass upon and characterize it, and it is not for the Court to determine its quality as matter of law. *Cook* v. *Traction Co.*, 80 Md. 558, and cases there cited.

Accepting this fixed and firmly established legal postulate it is insisted that the prominent, distinct and decisive act which should be characterized by the Court as contributing negli-

gence on the part of the motorman was his failure to look or listen for an approaching train, or his failure to see or to hear it if he did look or listen.    It is argued that if he had looked or listened he must have seen or heard the engine, and if he did see or hear it and attempted to cross in front of it, when it was too close for him to succeed, he was guilty of negligence; or if he did *not* see or hear it, it was because he failed to look or to listen for it, and that the attempt to cross without looking or listening was likewise culpable negligence.    It cannot be presumed that the motorman blindly ran his car into a perilous position, or that he was careless as to his own safety; because in solving the question of ordinary care on the part of the deceased in such emergencies and under such conditions it is competent to take into consideration, together with the other facts of a case, the known and usual disposition of men to guard themselves against danger.    *B. & O. R. R. Co.* v. *State, use of Dougherty*, 36 Md. 366.    Nor can it be said, if he did not see or hear the approaching engine, that he did not see or hear it because he did not look or listen, since his failure to see or to hear may well have been due to the darkness and to the absence of a headlight and to the omission to ring the bell, as well as to the obstruction of his view by the intervening watch-box.    The watchman whose duty it was to be constantly on the lookout for passing trains and to lower the gates upon their approach to the crossing, did not see or hear the locomotive which caused the injury until it was within ninety feet of the crossing and consequently too close, according to his testimony, to avoid the collision which immediately followed.    How could the Court say *as a matter of law* that the motorman was guilty of contributory negligence because he saw or heard, or because if he had looked or listened he would have seen or heard, the approaching engine before attempting to cross the tracks; when the positive testimony of the conductor, whose view point was vastly more advantageous than that of the motorman, distinctly shows that *he* saw and heard no engine though he went to the centre of the middle track expressly for the purpose of ascertaining

whether it was safe to cross?    It will not do, in the circum-
stances of this case, to say that if the conductor and mortor-
man did not see or hear the approaching engine it must have
been because they did not use their senses (*Reidel's case,*87 Md.
159), since the physical conditions which existed—such as the
absence of a headlight, the failure to ring the bell, the sharp
curve in the track, the situation of the watch-box and the
speed of the engine which covered a space of ninety feet in
less than eight seconds—rendered it not only possible but
highly probable that the conductor did not see or hear an ap-
proaching engine when he looked up and down the railroad
tracks, and that the motorman did nót see or hear it when he
started his car forward.    There is a broad difference between
not seeing an object because one does *not* look, and not seeing
it though one *does* look.    In the first instance a failure to
look, when the duty to look is imperative, is an act of negli-
gence; whereas in the other instance a failure to see when one
does look may be due to other causes than carelessness; and
hence to ascribe such last-named failure to the negligence of the
person not seeing would be to assume as proved the very
thing to be proved, notwithstanding the coincident circum-
stances rebutted or tended to rebut the assumption.    When
one says he looked and did not see an object, which, if he
had looked he, in the nature of things, *must* have seen, he
cannot be credited if he says he did not see the object; but
that conclusion cannot be adopted or applied when by reason
of the surrounding conditions it was possible for him to look
and still not see it.    Such conditions existed on the occasion
of the accident, according to the testimony adduced in behalf
of the plainttffs, and especially as concerned the motorman
whose situation east of the watch-box prevented him from
seeing more than seventy-five feet of the railroad tracks to the
west of him—the direction from which the engine came.    It
is true there was evidence adduced by the defendant from
which the jury, if they credited it, might have concluded that
the motorman recklessly ran into a visible danger, but with
that evidence we have nothing to do in considering the prayers

now under review.    The jury alone were authorized to weigh the evidence which was conflicting and their finding is not subject to revision in this Court.    If we were at liberty to consider it, it is not improbable that a conclusion would be reached, founded on the theory of concurrent negligence quite the opposite of that arrived at by the jury.    "But in no case ought the Court to take the question of negligence from the jury, unless the conduct of the plaintiff relied on as amounting *in law* to contributory negligence, is established .by *clear and uncontradicted* evidence."    *McMahon* v. *N. C. Ry. Co.*, 39 Md. 449.    It is for the jury to determine the credibility of testimony; and if the evidence offered by the plaintiff in an action is such that if believed by the jury they may lawfully find for the plaintiff, the case cannot be withdrawn from their consideration, although the plaintiff's evidence is contradicted in material particulars by that of the defendant.    *W. Md. R. R. Co.* v. *Kehoe*, 86 Md. 43.    In view of these familiar legal principles and of the facts which were testified to in behalf of the equitable plaintiffs, the Court of Common Pleas would not have been justified in withholding the case from the jury, and its refusal to grant the defendant's first, first A, and second prayers was therefore free from error.    The same reasons which sustained that ruling support the action of the Court in granting the first and second prayers of the plaintiffs and in overruling the defendant's special exceptions to those prayers. The third prayer of the plaintiffs was rejected and the first was withdrawn.    The fourth had relation to the measure of damages and was rightly granted.    Being rightly granted the special exception to it was properly overruled.

   The defendant's third, fourth, fifth, sixth and seventh prayers were granted and its eighth and ninth were rejected.    The questions raised by the eighth and ninth prayers are the only ones remaining to be considered.    If the structure of those two prayers is proper and if the subject-matter to which they relate is not included in and covered by instructions given at the instance of the defendant, then they ought to have been granted.    It must be borne in mind that there were three

distinct but simultaneous acts of negligence alleged to have been committed by the railroad company; viz., the neglect to lower the safety gates, the omission to have the headlight of the engine lit, and the failure to ring the engine bell.    If there were circumstances which eliminated or neutralized any one of those three concurrent acts the defendant was entitled to have the jury specifically instructed in regard thereto unless it preferred by a general instruction couched in comprehensive terms to couple them all together, without a particular designation of any of them.    In the consideration of the eighth and ninth prayers there are two inquiries to be answered, viz.; Is the structure of the prayers free from error; secondly, is the legal principle which they embody sufficiently stated in the granted instructions?    The eighth prayer is in these words: "If the jury believe from the evidence that the crossing at Ridgely street was a joint crossing used both by the defendant, the Baltimore and Ohio Railroad Company, and the United Railways and Electric Company, and that the deceased Philip T. Hendricks was a motorman operating a car of said United Railways and Electric Company, and that by the rules of said United Railways and Electric Company and the practice of its employees the not lowering of the gates was not treated as an assurance that the crossing was clear and was not on the occasion of this accident treated by said deceased and the conductor of his car as such assurance (*) then it was the duty of said deceased *to look and listen* for engines and trains while crossing said defendant's tracks, and if the jury further find from the evidence that the accident to deceased would not have occurred if said deceased *had* so looked and listened, then their verdict must be for the defendant."    The ninth prayer is precisely identical down to the asterisk, and from there it proceeds, "then it was the duty of said deceased while crossing said defendant's tracks to *exercise reasonable and ordinary care* to avoid collision with engines and cars of the said defendant, and if the jury further find that the *failure* of said deceased *to exercise such reasonable and ordinary care* directly contributed to cause the accident, then their verdict must be for the defendant."

When safety gates are erected and are required to be low-ered or closed upon the approach of an engine or train the fact that they are up or open is a substantial assurance of safety, just as significant as if the gateman had beckoned or invited a person to come on; and that an ordinarily prudent man would not be influenced by the open gates, is against all human experience. *N. C. Ry. Co.* v. *Gilmore*, 100 Md. 413. But if, from any cause, an individual about voluntarily to cross a railroad track, knows that the gates are not to be relied on as an indication of safety and nevertheless depends upon them, his dependence upon them without his observing the same pre-cautions which would be required of him if there were no safety gates there at all, would be an act of negligence which would defeat a recovery for an injury resulting from the omission to use such precautions.    It was therefore competent to the railroad company to call the attention of the jury to the rule of the electric railway company by which its con-ductors and motormen were instructed not to rely on the po-sition of the safety gates before crossing the railroad tracks; but both the eighth and ninth prayers relating to that subject were unfortunately defective in their structure, and the propo-sitions contained in both were fully covered by two of the instructions granted at the instance of the railroad company. Now, a prayer is defective in its structure if it either expressly or inferentially assumes as proved a fact which should be sub-mitted to the jury for them to find, especially when the burden of proving that fact is upon the party presenting the prayer. There is no principle better established than that which denies to the Court the right of assuming any fact, in aid of a prayer, when the *onus* of proving such fact rests upon the party ask-ing the instruction, no matter how strong and convincing his proof on the subject may be. *Peterson's Extrs.* v. *Ellicott*, 9 Md. 60.    The eighth prayer after the recital down to the asterisk declares, "then it was the duty of said deceased to *look and listen*  *  *  *  whilst crossing the defendant's tracks, and if the jury further find  *  *  *  that the acci-dent  *  *  *  would not have occurred if said deceased

had *so looked and listened,"* no recovery could he had; but it assumes by inference that the deceased did *not* look or listen. It did not require the jury to find that he ·did not look or listen. They would have been told if the prayer had been granted that if they should find that the accident would not have occurred if the deceasèd *had* looked and listened, that, in substance and effect, he *did not* look or listen; and thus the prayer assumed the existence of an important fact, without the occurrence of which no negligence could be predicated of the conduct of the deceased. If it was his duty to look and listen, then a failure to look and listen was a breach of that duty and was an act of negligence; but before the jury could say that the accident would not have happened if the deceased *had* looked and listened it was necessary for them to find that he did *not* look and listen, and that fact they were precluded from finding because the prayer assumed its existence. The same vice is found in the ninth prayer. If it had been granted the jury would have been told that it was the duty of the deceased whilst crossing the railroad tracks to exercise reasonable and ordinary care to avoid collisions; and they would have been further told that if they found that *the failure* of the deceased to exercise such reasonable and ordinary care directly contributed to cause the accident no recovery could be had, though they were not required to find that the deceased *did fail* to exercise reasonable and ordinary care to avoid a collision. The prayer assumed that the deceased *did fail* to use such care, and then declared that if the jury found that "the failure" in this respect directly contributed to cause the accident no recovery could be had. The fact of a failure to use due care was assumed and then the effect of such assumed failure, if the jury found that it "directly contributed to cause the accident" was defined; but no where was the question as to whether there had been such failure on the part of the deceased, left to the jury as a distinct and necessary inquiry. In the eighth prayer the legal consequence of an omission on the part of the deceased to look and listen is correctly stated, but the *fact* that he *did not* look or listen is

improperly assumed.   In the ninth prayer the legal conse-
quence of a failure to exercise reasonable and ordinary care
is correctly stated, but the *fact* that the deceased *did fail* to
exercise such care is improperly assumed.

The sixth prayer granted upon the request of the railroad
company includes every proposition which the eighth prayer
was intended to present.   Whilst the eighth prayer hypothet-
ically eliminated the safety gates from the issue of contributory
negligence, the sixth prayer covers every element relied on to
establish that asserted negligence.   By the sixth prayer the
Court instructed the jury that it was the duty of the deceased
to look and listen for locomotives and cars whilst crossing the
tracks, and that if they should find that had he so looked and
listened he could have known of the approach of the engine
in time to have avoided a collision with it, then no recovery
could be had.   Each of the three acts of asserted negligence
necessarily was embraced in the prayer.   If the gates were
up it was his duty to look and listen—if the headlight was not
lit, or if the bell was not rung it was likewise his duty to look
and listen. · Hence, precisely the hypothesis which the eighth
prayer set forth in express terms was implicitly within the scope
of the sixth prayer.   Exactly the same conditions exist in
respect to the fifth instruction and the ninth prayer.   The
former includes all that was asked for under the latter.

But it was contended that the rejection of the eighth and
ninth prayers in the presence of the jury prejudiced the rail-
road company by inducing the jury to suppose that the hy-
pothesis contained in the two rejected prayers were not in-
cluded in the fifth and sixth instructions.   A kindred objection
was before the Court in *B. & O. R. R. Co.* v. *Shipley*, 31 Md.
373, where it was said: "It may, however, be proper to re-
mark, that this Court cannot, in any case, consider what in-
fluence the rejection of one prayer and the granting of another
in the presence of the jury may have upon their verdict.   The
jury must, in all cases, be presumed to have acted on the law
of the case, as laid down by the Court in the instructions
given, irrespective of the rejected prayers on either side.

These latter are not before them, and they cannot allow the fact of their rejection to influence their verdict; and this Court is confined to a review of the law of instructions granted or refused, when presented by exceptions duly taken in each case.''

After a most careful consideration of the entire record it has been found that no error was committed by the trial Court; and though the verdict rendered by the jury may possibly be not the one which the evidence warranted, we are compelled to affirm the judgment because we have no authority to correct any mistakes the jury may have committed.

*Judgment affirmed with costs above and below.*