# EDWARD HEINZ *vs.* THE BALTIMORE AND OHIO RAILROAD COMPANY.

*Injury at Railway Crossing—Question of Plaintiff's Contributory Negligence for the Jury.*

Plaintiff, a man in full possession of his senses, driving on a dark night in an open wagon, going northwardly on a suburban street, approached a railway crossing. The tracks crossed the street at right angles. On the east side of the street were some small houses, the nearest of which was thirty-five feet from the track. Some cars were standing on a siding between that house and the tracks; the distance between the siding and the track being about ten feet. To a person

coming to the crossing from the south, as the plaintiff did, the view of the tracks to the east was shut out for one hundred feet by these obstructions.  A cluster of electric lights on a trolley pole near by and an oil lamp in a shop window across the street shed a dim light at the place.   When plaintiff reached the house on his right nearest to the track, he stopped and looked in both directions, and did so again when he got in front of the cars standing on the side track.  Not hearing or seeing anything, he started across the track, when his wagon was struck by the tender of a locomotive running backwards.   There were no lights on the engine or tender, and no whistle was blown or bell sounded at the time of .crossing.  In an action to recover damages for the injury so occasioned, *held,* that since this evidence on the part of the plaintiff shows that he did stop, look and listen, as he was bound to do under the dangerous condition then existing at the crossing, he was not guilty of contributory negligence in that respect, nor can such negligence be imputed to him as matter of law because he did not see or hear the approaching engine, since the darkness of the night, the absence of lights on the engine, the failure to ring the bell and the obstructions near the track rendered it possible that, although plaintiff stopped and looked, he did not see or hear, and that consequently the question of plaintiff's contributory negligence should have been submitted to the jury.

In an action to recover damages for an injury caused by the defendant's negligence, the case should not be withdrawn from the jury on the ground that the plaintiff was himself guilty of negligence directly contributing to the injury, unless there be clear and uncontradicted evidence that the plaintiff was guilty of some distinct act or omission which was obviously negligent.

*Decided June 23rd, 1910.*

Appeal from the Baltimore City Court (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS and URNER, JJ.

*Wm. H. Lawrence,* for the appellant.

*Duncan K. Brent* and *Allen S. Bowie,* for the appellee.

BURKE, J., delivered the opinion of the Court.

Edward Heinz, the appellant on this record, sued the Baltimore and Ohio Railroad Company to recover damages for personal injuries, &c., sustained by him and which he alleged were caused by the negligence of the defendant corporation. The injuries were received at the point where the defendant's road crosses First avenue in Anne Arundel County. This avenue is a public highway. It is a much used thoroughfare, and is about forty feet wide. It runs north and south, and on the east side thereof are located double tracks of the line of cars of the United Electric Railways Company running from Curtis Bay to Baltimore City. The defendant's road leads from Curtis Bay to Camden Station, and crosses First avenue practically at right angles.

The plaintiff was struck at this crossing on the night of February 11th, 1904, by a tender of the defendant's company attached to one of its locomotives, and, according to the evidence produced by him, was severely injured. The tender and locomotive were running west from Curtis Bay. At the conclusion of the plaintiff's case the trial Court, at the instance of the defendant, instructed the jury that by the undisputed evidence in the case the plaintiff's negligence directly contributed to the happening of the accident, and, therefore, he was not entitled to recover. In obedience to this instruction the jury rendered a verdict in favor of the defendant, and from the judgment thereon entered the plaintiff has brought this appeal.

Was the trial Court right in deciding that, as matter of law, the plaintiff was guilty of contributory negligence? This is the only question in the case, and its determination involves a careful examination of all the facts and circumstances which may reflect light upon it.

In dealing with that question the Court must assume the truth of all the evidence offered by the plaintiff, and he is also entitled to the benefit of all legitimate inferences deducible therefrom.  It is important to understand the exact conditions at the place of the accident, the surrounding circumstances, the character of the night, and the conduct of the plaintiff as he approached and attempted to cross the tracks of the defendant.

On the east side of First avenue near the crossing there are a number of small brick houses.  The nearest one of these is about thirty-five feet from the railroad track.  Between this house and the track there is a railroad siding beginning at some point on the track east of the crossing and running up to First avenue, at which point the distance between the railroad track and the siding is only about ten feet.  On the night of the accident there were some cars on this siding, one of which was pushed out some little distance in the public highway.  How many cars were on the crossing does not certainly appear.  The plaintiff at first spoke of box cars being on this siding; but afterwards said that he could not tell whether there was more than one box car there.  The witness Ward said there were box cars on the siding, and that one of these cars projected beyond the house line three or four feet, and that persons using the walk that night "had to go around a little ways to get around the end of that car, further than usual."  The box cars, he thought, were twelve feet high and thirty-two or thirty-four feet long.

Ernest R. Kruse testified that there were two box cars and a gondola on the siding that night, and that the box cars were nearest the highway.  Reinhardt said there were three box cars on siding and two flat cars attached on the far end.  If this evidence be true, the view of the main track for about one hundred feet was completely shut out from one approaching the crossing from the south, and this obstruction was not over ten feet from the track.  From the nearest

house on the east side of the avenue to the box cars the distance was not over twenty feet.

On the west side of the avenue north of the crossing there is a row of houses. The nearest of these houses was McCrackin's grocery store, located on the northwest corner about twenty feet from the railroad track. There are some houses on the east side north of the crossing, but these are not so near the railroad as those on the west. It was a dark night. There were three electric lights on the west side of First avenue attached to a trolley pole of the United Electric Railways Company, and two signal lights to guide the motormen of that company. There was also a coal oil lamp burning in McCrackin's store, which threw some little light about the crossing. One of the witnesses testified that there was practically no light on the crossing that night, and all the evidence is to the effect that the crossing was very dimly lighted. There is abundant evidence in the record from which the jury could have found that there were no lights on the engine, or tender, and that no whistle was blown or bell sounded. There is nothing in the evidence to show the size of the tender or of the locomotive, or the rate of speed at which they were running. There is evidence that when there are cars on the siding one cannot see the tracks of the defendant company as he approaches the crossing after passing the last house on the east side of the avenue, because, as the witness Ward testified, "there is an embankment down that track; there is a cut there, and it is a deep cut; and if you put me a foot from that house and put cars on that track I cannot see nothing down that track." Such being the situation which confronted the plaintiff as he approached the crossing, we will next examine the testimony as to how the accident occurred.

The plaintiff appears to have been an active business man. He was forty-three years old, and was healthy, strong and in the full possession of all his faculties. For twenty-five years he had been engaged in the butchering and live stock business. He had a stall in the Hanover Market, two

stalls in the Cross Street Market, and did a wholesale business from his slaughter house. On the afternoon of February 11th, 1904, he left his home and drove to Curtis Bay, and after transacting some business there and in the immediate vicinity, he started on his return to the city. He was riding in a buckboard, but the top was not up. He described the mare he was driving as a "trotting mare; she could go along at a pretty good gait; she was never used for speed purposes; she was well broke; she was family broke; she was a mare that my wife had driven and my children; she is a good, sound, safe mare, and is able to do better than four minutes; she is not afraid of anything; she is a mare that was quiet."

He described the accident as follows: "I drove down to some houses, and after I passed them, I stopped and looked in both directions; as I drove past the house, I stopped and looked both ways, and I did not see anything approaching. I continued on a little further, and I got about in front of the cars that were on the side track, and I stopped again either in front of them, or before I got in front of them, one or the other. I listened again, and saw nothing in sight at all and heard nothng. So I continued on, and as I started across the track there was something dark coming towards me, and as it did I jerked my horse with my left hand in order to try to get away from it, and at the time it came out like a flash, and I think it struck my first wheel, and as it struck the front wheel it broke the vehicle down and threw me up against the engine and hit me here on the head, and as it did it carried me off, and where I landed I do not 'know." Further testifying, he said: "I cannot tell whether there was more than one box car on this siding at the time of the accident. As I looked down the other way to get a view of the track beyond that switch and along that to see if anything was coming towards the road, and I looked from there over to the other side to see if there was anything coming from the other direction, from across the bridge from the

river from the west side, and therefore I did not pay any attention to the cars that were on this track, with the exception of this one that extended out to the front; I had to get up to that when I stopped to listen. I heard no bell of any description; no whistle of any kind; no alarm of any kind. This happened on a very dark night, and there was no light scarcely; there was only a small cluster of electric lights; there was no light except a cluster on an electric pole on the electric railway line, and these lights were very dim; there was a store there that throws a reflection across the road."

Joseph T. Ward testified that he saw the plaintiff immediately before the accident, and that he was driving down the road "in a little dog trot," and that "right above the corner of the house, just at the edge of the house (meaning the last house in the block south of the crossing) Heinz checked up, people generally do along there; then he got down by the opposite car, and I saw him stop a second time; and then I turned, and then I heard this crash. I saw him make two stops, and I did not follow him with my eyes any more."

Carrie Thomas testified that she saw "Mr. Heinz coming down the road, and he stopped at the corner house where the brick houses are, and he rode down further, and he stopped at the track, and as he was crossing the track the engine came up and hit him." No witness saw the locomotive and tender before it reached the crossing except Kruse, and he is the only one who said he heard any noise of its approach. He was standing on the steps of the fifth house north of the crossing, and saw the engine and tender coming down the track. How near to the crossing they were at that time he did not say; but the evidence and surrounding circumstances show that they must have been close to it. He described the noise made by the approaching engine and tender "as a rumbling noise."

The question of the plaintiff's contributory negligence upon the facts disclosed by the record should have been submitted to the jury. In no case ought the Court to take the

question of negligence from the jury, unless the conduct of
the plaintiff relied on as amounting in law to contributory
negligence is established by *clear* and *uncontradicted* evi-
dence.  The act relied on to establish, as a matter of law,
the existence of contributory negligence must be distinct,
prominent, and decisive and one about which ordinary minds
would not differ in declaring it to be negligent.  Where the
nature and attribute of an act relied on to show negligence
contributing to an injury can only be determined correctly by
considering all the attending and surrounding circumstances
of the transaction, it falls within the province of the jury to
pass upon and characterize it, and it is not for the Court to
determine its quality as matter of law.  *McMahon* v. *North-
ern Central Railway Company,* 39 Md. 449; *Cooke* v. *Trac-
tion Company,* 80 Md. 558; *B. & O. R. R. Co.* v. *Hendricks,*
104 Md. 84.  By the settled law of this State certain well
defined and imperative duties are imposed upon persons be-
fore they make the attempt to cross the tracks of a railroad
company.  They are bound under all circumstances to look
and listen for approaching trains, and if the crossing is one
of more than ordinary danger and the view of the tracks is
obstructed at or near the place of crossing it is the duty of
the traveler to *stop, look and listen* before he attempts to
cross, and if a person neglects these necessary precautions,
and in consequence of such neglect is injured by the colli-
sion with a passing train he will be held to have contributed
by his own negligence to the occurrence of the accident, and
will not be allowed to recover for any injury he may have
sustained.  *Manfuso* v. *Western Maryland R. R. Co.,* 102
Md. 216, and cases there cited.

Negligence is the failure to do what a person of ordinary
prudence would have done under the circumstances of the
situation, or doing what such a person under such circum-
stances would not have done.  Apart from the situation and
the surrounding circumstances no act or omission can be pro-
nounced negligent.  The situation and all its surrounding

conditions in which one acts must necessarily be considered before negligence *vel non* can be predicated of his act or omission. The standard of duty by which acts or omissions are measured is the care and caution of the average prudent man, and he who is to judge must place himself as near as may be in the position of him whose conduct is under consideration. The degree of care and caution, which one is required to observe, must of necessity vary with the act to be done, or with the different conditions, or changing circumstances of the particular situation. But no matter what the situation is the care and caution of the prudent man is the accustomed and proper measure of duty, and the Court, will not, except in rare cases, deny to the plaintiff the right to have the question of his failure of duty passed upon by the jury. *Geiselman* v. *Schmidt,* 106 Md. 584.

The evidence shows and the prayer concedes the defendant's negligence. It is also shown that the plaintiff stopped, looked, and listened before he made the attempt to cross, as he was bound to do under the dangerous conditions existing at the crossing that night. He stopped, looked and listened twice, and the last stop made by him was very near the track. Assuming the testimony on this point to be true, there was no failure of duty in this respect. Nor can it be said that he was guilty, as matter of law, of contributory negligence because he did not see or hear the approaching tender and engine under the conditions and circumstances confronting him. His not seeing or hearing them approaching, even though he did look and listen, is quite different from not seeing or hearing them by reason of his failure to stop, look and listen. In the latter instance his failure to see them would have resulted from his omission to do that which it was his plain duty to do, viz, to stop, look and listen; whereas, in the first instance, his failure to see or hear might have resulted from one or more of many causes which invovled no negligence on his part whatever. *Cooke* v. *Traction Company, supra.*

There are conditions in which the law will not credit the testimony of one who says he looked and listened, and did not see or hear; *but this is confined to conditions where in the nature of things he must have seen or heard if he had looked or listened.* The case of the *Annapolis, etc., R. R. Co. v. Hickox,* 104 Md. 659, is a good illustrative case on this point; but that case cannot be applied here, because the facts of the two cases differ widely. There the accident happened in broad day light, and the deceased was well acquainted with the crossing and of the time of the passing trains. As that case was strongly relied upon by the appellee to support the ruling of the trial Court, we will quote from the opinion of JUDGE BOYD the circumstances under which the accident happened: "Mr. Hickox's residence was seven or eight hundred feet from the railroad and he was familiar with the running of the trains on it. His farm was about two miles from Annapolis and he had driven his son-in-law there, and had gone after him in the evening, nearly every day of three months before the accident. With the exception of a short time, he had lived on that farm for a number of years. He was injured on December 30th, 1904, and died in a short time. He was driving from Annapolis when the accident occurred and was struck by a regular passenger train which let there 8.43 A. M. His son-in-law testified that he "was killed about 8.45 in the morning" (referring doubtless to the time of the accident), and the evidence of the trainmen showed that it was running on scheduled time. The county road runs close to and parallel with the railroad near Camp Parole, and is about thirty-five or forty feet from it where the private road, leading from the Hickox place, leaves it. The only witness to the accident, excepting the engineer, was a colored girl named Lulu Queen who was going from Mr. Hickox's place in the direction of the railroad. She testified that "just as he left the county road he stopped and looked out—looked up and down"—on cross-examination she said "just as he turned in, he stopped, looked and listened."

When asked whether he did so when he got to the track she said "no, sir, he didn't do it when he got to the track," and repeated several times that it was "at the instant" he turned in the road he stopped and looked. The engineer said "the first I saw was a team coming across with a horse, and I looked around and saw the horse galloping across the track. I reached in and grabbed the air, but it struck the buggy between the two wheels." He also testified that it was about fifteen or twenty yards away when he first saw the horse and that he did everything he could to avoid the accident. From the point where Mr. Hickox turned into the private road he could ordinarily have seen down the railroad some distance in the direction of Annapolis, but the plaintiff's evidence was to the effect that there was a number of crossties piled between the county road and railroad, which obstructed his view. After passing the crossties, and before getting on the railroad, he could have seen at least as far as Camp Parole Station, which was variously stated by the witnesses to be two or three hundred yards, but the superintendent of the company testified that it was ten hundred and eighty feet from the station to the private crossing, by actual measurement."

It was in reference to this state of facts that the Court said: "If he could see down the track from the point where he 'stopped, looked and listened,' and did not see or hear the train, it must have been because there was no train close enough to be seen or heard, and if by reason of the obstruction of the crossties he could not see down the track, he was required to exercise care when he got near the track, where he could see and certainly could have heard the train coming, if he was listening. For it is no excuse for one not to stop, look and listen when he is near the track because he did so further away, at a point where he could not see, if he looked, and according to the plaintiffs' contention could not hear, if he listened. If his view was obstructed, and the sound interfered with, it made it all the more important for

him to stop again. There was no difficulty in seeing down
the road to Camp Parole station, after he reached a point
about fifteen feet from the track. The witnesses differ some-
what as to that distance, between the track and the pile of
crossties, but the lowest put it at ten or twelve feet, and one
as high as twenty-five feet. Lulu Queen, the witness to the
accident, said the crossties were five or six yards from the
track. Even if they were only ten or twelve feet away, if
up to that point they obstructed the view from the private
road, it was the duty of the deceased to again stop, look and
listen for the train, which he had reason to expect."

The case now before us in many of its main features is
very much like the case of the *Baltimore & Ohio R. R. Co.*
v. *Hendricks,* 104 Md. 76, where it appears that Hendricks,
a motorman of the United Electric Railways Company, was
killed at night whilst in the act of running his car across the
track of the railroad at Ridgely street in the City of Balti-
more. The electric car was struck by an engine of the rail-
road company, and Hendricks was so seriously injured that
he died in a few days. An application was made by the
company to take the case from the jury upon the ground that
the deceased was guilty of contributory negligence in not
seeing or hearing the approaching engine. This prayer was
refused by the trial Court and its ruling was affirmed on the
appeal. In discussing the prayer, the following language of
JUDGE McSHERRY is strikingly applicable to the case at bar:
"It will not do, in circumstances of this case, to say that if
the conductor and motorman did not see or hear the ap-
proaching engine it must have been because they did not use
their senses (*Reidel's Case,* 87 Md. 159), since the physical
conditions which existed—such as the absence of a head
light, the failure to ring the bell, the sharp curve in the
track, the situation of the watch box and the speed of the
engine which covered a space of ninety feet in less than eight
seconds—rendered it not only possible but highly proba-
ble that the conductor did not see or hear an approaching

engine when he looked up and down the railroad track, and that the motorman did not see or hear it when he started his car forward. There is a broad difference between not seeing an object because one does *not* look, and not seeing it though one *does* look. In the first instance a failure to look, when the duty to look is imperative is an act of negligence; whereas in the other instance the failure to see when one does look may be due to other causes than carelessness; and hence to ascribe such last-named failure to the negligence of the person not seeing would be to assume as proved the very thing to be proved, notwithstanding the coincident circumstances rebutted or tended to rebut the assumption. When one says he looked and did not see an object, which, if he had looked he, in the nature of things, *must* have seen, he cannot be credited if he says he did not see the object; but that conclusion cannot be adopted or applied when by reason of the surrounding conditions it was possible for him to look and still not see it. Such conditions existed on the occasion of the accident, according to the testimony adduced in behalf of the plaintiff, and especially as concerned the motorman whose situation east of the watchbox prevented him from seeing more than seventy-five feet of the railroad tracks to the west of him—the direction from which the engine came."

As the evidence does not show the plaintiff to have been guilty, as matter of law, of contributory negligence, the judgment will be reversed and a new trial awarded.

*Judgment reversed with costs and a new trial awarded.*