(Decided June 23rd, 1897).

THE NORTHERN CENTRAL RY. CO. *vs.* MAUD MEDAIRY, by Her Next Friend, &c.

*Negligence—Accident at Railway Crossing—Legal Sufficiency of Evidence—Watchman at Crossing.*

Plaintiff, a young woman, was injured by defendant's train at a railway crossing in a country village. In an action to recover damages the uncontradicted evidence was to the effect that the train by which plaintiff was struck was a freight train running twenty miles an hour ; that the whistle was blown a quarter of a mile below the crossing and the engine bell was afterwards rung ; that a lookout was kept on the engine and the plaintiff was not perceived until just before the

accident. Another train, going in the opposite direction, passed the crossing immediately before the arrival of the one causing the injury. The latter could have been seen for nearly 400 feet from the crossing. There was no watchman there, but a signal bell was ringing. Plaintiff testified that she looked before stepping upon the track but saw nothing. *Held*, that there is no legally sufficient evidence of defendant's negligence and that the case should be withdrawn from the jury.

If a witness who can see testifies that although he looked he did not see an object which, if he had really looked he must have seen, such testimony is unworthy of consideration.

A railway company is not bound to station flagmen at the crossings of public roads unless required so to do under Code Art. 23, sec. 194, and a failure to put a flagman even at a dangerous crossing is not *per se* negligence.

When an accident occurs at a railway crossing the fact that the train was behind time or that there was a curve in the road at that point does not constitute evidence of negligence.

Appeal from the Circuit Court for Carroll County (ROBERTS, C. J., JONES and REVELL, JJ.)

On the night of December 9th, 1895, about half-past six P. M., two sisters, living in the village of Phoenix, in Baltimore County—one, at the time, seventeen years of age, and the other, the plaintiff, fifteen years old—started from a store in said village to go on an errand for their mother, across the railroad tracks of the defendant, to a small house on the west side of the railroad. Their course took them through the village, and along a public road to the public crossing, at or near the railroad station, and as they approached said crossing, they stopped on a bridge on the village side at a point within eleven feet of said crossing, and awaited the passing of a train going south. Immediately upon the train being clear of the crossing, after looking and listening, they started across said railroad tracks, and just as they reached the easternmost rail of the north-bound track, they were struck by an engine hauling a freight train, which approached from Baltimore ; the elder sister being killed, and the plaintiff injured. Phoenix is a village situated on the east side of the railroad, about seventeen miles from

Baltimore, and consists of a factory, three stores, a public school, postoffice, a church and some houses. The railroad, which is a double track road, as it approaches Phoenix from the south, has on its east side a bank which extends from a distance of 815 feet south from the crossing, at which point are situated two water tanks, to a point within almost 385 feet of the crossing and on the west side of the railroad is the Gunpowder River, which at this point is a fair sized stream ; the railroad also being somewhat curved along this portion of the road. Just at the end of the embankment, at the point distant from the railroad crossing of about 385 feet south of the crossing, on the east side of the railroad, is a switch or siding, the tracks of said siding running up to the factory situated in said village, and, as is usual, at said switch is a switch signal about twelve feet high, having colored arms to denote whether or not the switch is open, and at night colored lights for the same purpose. The station-house at Phoenix is also situated on the east side of the railroad, south of the crossing, and between the crossing and the switch signal. At the crossing itself, the tail race from the factory flows into the river, and the railroad crosses said tail race over a bridge. As the public road approaches the railroad from the east, or on the east side of the railroad, it also crosses this tail race over an iron span open bridge, the sides of which bridge are about five feet high, the braces being diagonally placed, and the ends bearing back at an angle of about forty-five degrees ; the end of this bridge nearest to the track approaches to within a distance of 8 to 10 feet of the easternmost rail of the north-bound track. The track on the east side of the railroad nearest the county bridge being called the north-bound track, because trains going north from Baltimore, use it ; and the other track, or west track, is called the south-bound track.

Approaching the railroad crossing from the village, there was at the time of the accident nothing to obstruct the view of the trains approaching *from the north.* The station-house

obstructs the view of the track looking south, and the trains
approaching from that direction from a point just before one
reaches the east end of the county bridge over the tail race,
until one gets to within a few feet of the west end of the
bridge, the bridge being 51 feet long.   From a point two
feet away from the west end of the said bridge, there is a
view of the railroad tracks *to the south* for a distance of 815
feet, at which point the road curves around an embankment
and is lost to view.   The railroad company, for a number
of years, has maintained, as a signal to warn those using this
crossing of the approach of its train from either the north
or south, what is known as an electric signal bell, erected
on the west side of the railroad tracks at a distance of about
8 feet from the tracks, and stands about 12 feet high.

The plaintiff obtained a judgment below for $5,000.

The cause was argued before McSherry, C. J., Bryan,
Fowler, Briscoe, Page and Boyd, JJ.

*John J. Donaldson* and *Charles H. Carter*, for the appel-
lant.

*Harry M. Clabaugh, Attorney-General,* and *W. Frank
Tucker* (with whom were *John I. Yellott* and *John M. Rob-
erts* on the brief), for the appellee.

Fowler, J., delivered the opinion of the Court.

This is an action to recover damages for injuries alleged
to have been sustained through the negligence of the defen-
dant, the Northern Central Railway Company, by Maud
Medairy, a young girl. . She sues by her mother and next
friend.

At the close of the plaintiff's case the defendant asked
the Court to take it from the jury, because, as was con-
tended, no legally sufficient evidence had been offered to
show negligence on the part of the defendant or its agents.
But the prayer was refused.   We are all of opinion it should
have been granted, because we are unable to discover in the

record any evidence legally sufficient to support the verdict of the jury. The first witness called by the plaintiff to testify as to the facts of the accident is Albert Cramer. His testimony is as follows : " I am employed by the Northern Central Railroad, and am the engineer of the train that killed one of these young ladies and crippled the other; my train is known as a second-class train, a fast freight train ; we were running about 20 miles an hour, our schedule time ; our only stops were to take water ; we were three minutes late that night at Phoenix, and I was not trying to make up time, but just used my schedule time ; I blew my whistle for the crossing, and the engine bell was rung ; the engine bell was rung after I sounded for the crossing. I blew for the crossing at the whistling-post, about a quarter of a mile below."

On cross-examination witness testified as follows :

" I left Baltimore that afternoon, the 9th of December, at 5.40 ; I blew my whistle for this crossing at the whistling-post, which is about a quarter of a mile from the crossing, and is nearer to Baltimore than the water-tank mentioned in the evidence ; the fireman rang the bell, I kept a lookout to see if I could see anything, and I passed the engine of the other train coming south, at the water tower. I was on the lookout all the way up, and the first I saw of these girls was just about the time I struck them ; I saw the packages going in the air, but I could not tell whether I had hit them or not; I always keep a lookout, especially around a station ; these girls must have been about the outside rail ; I blew down brakes, and stopped as quick as I could." The only other witness who was examined by the plaintiff to show how she was injured was the plaintiff herself. She said she lived at Phoenix and had been working at the factory there for about three years ; that on December the 9th, 1895, in the evening when it was quite dark she and her sister were going to visit a neighbor on the west side of the railroad. "While we were crossing the bridge, we heard the south-bound train whistle for Phoenix, and we walked

to the end, nearly, of the bridge and stopped until the train passed, and we walked up and down the track and listened and we heard no noise except what the down train made, and we saw the crossing clear, and we started to cross, and I remember we got over the first rail and I knew no more." The bridge which the witness mentions is a part of the public road which crosses the railroad at this point, and the west end of the bridge is several feet east of the track which is used for the north-bound trains. The plaintiff could not tell how long she stood on this bridge, waiting for the south-bound train to pass ; but she said when it passed she looked up and down the road and saw nothing, and heard nothing except the noise of the train that was going down. She was unable to state the distance from the point where she stood on the bridge to the railroad track where she was struck, nor could she say how far down the railroad she could see a train coming at the time when she looked.

From this testimony it is not only evident that there is no proof of any act of negligence on the part of the defendant, but there is positive proof contained in the testimony of the witness Cramer, which is uncontradicted, that the proper and usual signals were given, and the proper lookout kept up as the train approached the station. The plaintiff does not undertake to say that the electric signal bell at the crossing was not ringing as she approached the track. She says she did not hear it, and that if it did ring she did not remember hearing it. In point of fact the bell was ringing as is shown by the overwhelming proof of defendant's witnesses. Nor does the plaintiff, nor any other witness say that the whistle did not blow, nor that the engine bell did not ring. The only noise she heard, she says, was that made by the south-bound train. She says that she stood near the end of the bridge next to the railroad and that she looked before attempting to cross and saw nothing, and yet, according to the evidence of her own witness, Allen, she could have seen the engine at the switch signal post, which is 385 feet distant from the point from which she appears to

have been when she looked. If she had seen the engine even half that distance away she certainly could have avoided stepping on the track, and if, as there was, a point in her walk from the bridge to the track from which she could see down the track far enough to avoid danger, it was her duty to look then and there. But, assuming as was contended, that the plaintiff looked when and where she should have looked and as she says, saw nothing, such testimony, as we said in the recent case of *The Traction Company* v. *Helms*, 84 Md. 515, is unworthy of consideration and should not, therefore, be submitted to the jury.

What we have said disposes of the case, and it will be seen that we are of opinion that the plaintiff has not only failed to offer any legally sufficient proof of negligence, but one of her own witnesses, the engineman, Cramer, proved that the usual signals of warning were given by him and the fireman as the train approached the station.

In addition to what we have said, perhaps we should correct what appears to be a misapprehension as to the scope of the decision of this Court in the case of the *B. & O. R. R. Co.* v. *Owings*, 65 Md. 502. In the cause before us the Court below was asked and refused to instruct the jury that they could not infer any negligence on its part from the fact that it did not have a watchman or flagman at Phoenix's station crossing. The plaintiff proved and relied upon this fact as an act of negligence. *Owings' case* was cited to support this ruling of the Court below; but it will appear from an examination of that case that a prayer like the one refused below in this case was conceded and, of course, not considered here. The language on which the appellees base their contention will be found in a quotation from the opinion of the Supreme Court of the United States in the case of the *Continental Impt. Co.* v. *Stead*, 95 U. S. 161. It is as follows : " The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises,

and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable watchmen should be stationed at the crossing." It could not have been, and was not intended thus without even referring to it to reverse the previous well-considered decision of this Court in the case of *Foy* v. *Railroad*, 47 Md. 85, in which it was said that the law does not impose the obligation upon a railroad company to station persons at every crossing of a public road to warn travellers of approaching trains, and the following language of BRAMWELL, B., and the case of *Stubley* v. *The London and North Western Railway Co.*, Law Rep. 1 Exch. 13, was quoted as follows : "Need there be any one to warn persons of a train, which they can see so far off, that if they only take the trouble to look out for it, it cannot overtake them in crossing." Nor does the fact that the train was behind time, *Foy's case, supra*, nor that there was a curve in the railroad at that point, afford any evidence of negligence. *Annapolis and Baltimore Short Line Railroad Co.* v. *Pumphrey*, 72 Md. 85. But now the duty of railroad companies in this State in respect to the protection to be given the public at public crossings is regulated by Statute, Art. 23, sec. 194, Code Pub. Genl. Laws : "Whenever the several railroads of this State operated by steam shall cross any public highway at grade outside the corporate limits of cities, and any such highway shall be believed to be of such character as to render the passage of locomotives and trains thereon dangerous to life and property, it shall be the duty of the commissioners of the county in which such point of crossing shall be located to notify the company owning or operating the railroad at such point," if after certain proceedings they shall so determine either to place a flagman at such crossing or a system of electric alarm bells, or to erect safety gates or change the grade crossing.

If, as a number of respectable witnesses testified, the crossing at Phoenix is believed to be, or in their opinion is dangerous, and the safety of persons crossing there demanded

more than the ordinary and usual signals, ample means are provided by this statute for the protection of the rights of the public as well as those of the company. The defendant appears to have realized the fact that at this crossing it was its duty to exercise more than ordinary care, for it adopted without notice from the County Commissioners, so far as the record discloses, one of the three expedients, an electric signal bell, provided by the statute for additional protection at dangerous crossings. Under these circumstances and in view of the statutory provisions and the previous decisions of this Court, it would be impossible for us to say that the failure of the defendant to place a flagman at this crossing constituted negligence.

For the error committed in refusing to grant the defendant's first prayer without regard to the other questions presented by this appeal, the judgment appealed from must be reversed.

*Judgment reversed without awarding a new trial.*

(Decided June 23rd, 1897).