# THE MARYLAND ELECTRIC RAILWAY COMPANY *vs.* GEORGE THOMAS BEASLEY.

*Negligence: railroads; duty of parties crossing tracks; safety devices; action at other periods; evidence; admissibility; discretion of trial Court. Photographs taken after the event; admissibility.*

Where it becomes necessary to affect those charged with the duty of keeping highways, bridges or other structures in a safe condition, etc., or where it is a question as to the safety or availability of a machine or contrivance designed for a particular purpose, or use, evidence is admissible to show how it serves when put to that use, or what occurrences make its defect or incompetency notorious.        p. 276

In an action for damages for injuries sustained by the plaintiff from an electric car at a railroad crossing, evidence was held to be admissible to show that the electric signal at the crossing was usually out of order, sometimes ringing continuously when no car was coming, and sometimes not ringing when a car was coming, even though the testimony was as to indefinite periods prior to the accident.        p. 277

It is in the discretion of the trial Court that such evidence should not be of a time too remote from the accident.

p. 277

Whether a photograph of the place of an accident taken after the event is admissible, should, in general, be left to the discretion of the trial Court; and its action thereon should be final without clearer proof that the injury was occasioned thereby.        p. 277

A railway track itself is a warning of danger.        p. 278

In damage cases, when one who can see and hear testifies that he looked and listened, but did not see or hear an object which if he really looked and listened he must have heard, such testimony is unworthy of consideration.        p. 279

*Decided January 11th, 1912.*

Appeal from the Circuit Court for Howard County (BRASHEARS and FORSYTHE, JJ.).

The cause was argued before BOYD, C. J., PEARCE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*Charles A. Marshall* and *Robertson Griswold,* for the appellant.

*Robert Moss* (with whom was *Joseph L. Donovan* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This suit was brought by the appellee to recover damages resulting from a collision at Shipley Station, on the line of the Maryland Electric Railways Company, between one of the appellants' cars and a team of mules and wagon belonging to the appellee, one of the mules being killed, the wagon and load of peas destroyed, and the harness much broken and injured. The driver of the wagon also sustained injuries for which he has brought suit, the result of which, by agreement of counsel, is to abide the decision of this appeal.

The public road from Severn to Baltimore crosses the railways track at Shipley Station, and is used day and night by a very large number of teams hauling produce of all sorts to market. The county road at that crossing, going towards Baltimore, runs near North East and crosses the track at an angle of about forty degrees. The approach of the railway to the station coming from Baltimore is through a deep cut, the course before entering the cut being nearly due south, but curving in the cut until it emerges from it, until at the crossing the course is about southeast. It appears from the testimony of the plaintiff, as a result of actual measurement by him, that a car approaching this crossing from Baltimore comes first into the vision of one at the crossing, or ten feet therefrom, at a point 450 feet from the center of the crossing, as is shown on the blue

print used at the argument.   There is an automatic bell
at the station, the purpose of which is to warn travelers of
the approach of trains, but there was evidence from a num-
ber of witnesses that it rang frequently when there were no
cars approaching, and frequently failed to ring when they
were approaching.   Mr. Warthen, who lived at Shipley in
May, 1910, said it rang "continuously most of the time",
though sometimes it acted properly, that it was a nuisance
and disturbed him so much at night that he wrote to the
company about it, it might have been a week or as much
as two weeks before the accident, but he could not tell just
how long.   Mr. Stockett said he lived close to Shipley
Station up to October, 1909; that he had known this bell to
ring 24 to 48 hours on a stretch; that it became a nuisance
and he complained to the company and they gave him a key
to the box so he could stop it, and he had stoppd it as late
as ten o'clock at night.   Mr. Kelley said he often heard it
ringing when there was no car coming; that he had waited
on that account as much as ten minutes before attempting
to cross, and had become so hardened to it that he paid no
attention to its ringing during the last year or so.   He
drove over that crossing the day of the accident, but could
not say whether the bell then rang.   Mr. Ford, who lived
about two hundred yards distant, said seven out of ten times
when it would be ringing there would be no car coming; that
he crossed there that day, but the bell was not ringing at that
time.   Richard Hall said he crossed there frequently, going
to and coming from Baltimore, when the bell was ringing
and there was no car coming.   This was in the summer of
1910, but he could not say whether it was before or after
this accident, and there was similar testimony from other
witnesses.

Wesley Forrester, the driver of the team, testified that
he left Mr. Beasley's about seven miles from Shipley about
9:30 June 14th, 1910; the night was foggy; his mules
walked most of the time and he could see their heads as he
drove along; that he had been driving that road five or six

years day and night and he knew this bell, and knew it often rang continuously whether cars were coming or not; that as he approached that night he stopped thirty or forty yards from the track, and heard the bell ringing faintly, but heard nothing else; then went up to the track, stopped, looked in both directions, listened but saw nothing and heard nothing except the bell, and then went on; that the first notice he had that the car was coming was when he saw the headlight right on top of him.

On cross-examination he said he stopped at the track two or three minutes, before attempting to cross, and he had stopped at other times when the bell was ringing, as much as ten or fifteen minutes, and had waited until three or four other wagons came along and crossed before him. He said he was not asleep when he approached the crossing and had not been asleep that night, but that he would not swear that as he came to the crossing he did not have his hands and his head down; that he did not hear either a station signal or a danger signal from the car, and that he is positive he would have heard either or both, if they were given.

Harry Albaugh testified for the defendant that he left Baltimore on the 14th of June, 1910, on the 11:35 P. M. car; that he occupied the front seat on the front car on the right-hand side, the motorman being on the left; that the car had a bright headlight, and he could see blades of grass in the track 200 feet ahead; that he had been keeping notice of the whistle being blown, and just before they got to the curve approaching Shipley a real sharp whistle was given; that just as they came around the curve he saw the head of one mule going very slowly across the track; that he jumped and then saw both mules and saw a man "sitting in the seat with his head down and the reins in his hands carelessly like this (indicating)." The man on the wagon never made a move to get out of the way, and when he saw the car was going to hit them, he moved back in the car, but facing front all the time; that he felt the car tremble as the brakes were applied; that the whistle was blown before the team

was in sight, and after it was in sight, six or eight times; that the bell was ringing all the time when the car stopped until the car backed into the siding, and began again as the Annapolis car approached; that the motorman slowed up before he hit the curve and he judged the car after that was going about half as fast as before.

Allan T. Hopkins was on the right-hand side about the middle of the front car, there being two on the train, with a bright headlight; the whistle was sounded as they approached the curve, and again just as they came around the curve. He did not see the mules, but saw the motorman apply the brakes two or three seconds before the collision, and that the car was going at a moderate speed.

W. C. Kennedy was in the center of the first car with his window up. When the emergency brakes were applied he looked out and saw the heads of two mules on the track, and he judged the car was about 150 feet from the crossing; heard the whistle blow when the emergency brakes were applied and also before.

V. J. Vanous, the conductor in charge that night, said the regular crossing signal was blown just before they reached Shipley about 150 yards from the crossing, and the danger signal following from five to ten seconds later as well as he could judge.

Wm. T. Scible, the motorman on the car testified that he stopped at Linthicum, the station just north of Shipley, and after leaving Linthicum blew for Shipley, and at a reasonable distance blew for that crossing; that as he eased up on the car and swung round the curve he saw the tail end of the wagon on the track about 100 feet away; that he grabbed the brake with one hand and the whistle cord with the other and shut his eyes to keep out of flying glass, and when he stopped, the wagon was mashed into pieces.

The blue print already referred to was then put in evidence and Mr., Layng, the engineer who made the plat, testified to its accuracy, and said that when a car coming from Baltimore is 600 feet from the crossing, the headlight strikes

the road 127 feet from the crossing, and when the car is 198 feet from the crossing, it strikes the road 49 feet from the crossing. He said there was no change in the surroundings affecting the vision of the light, as only a little had been cut out of the tops of the trees near the station above the line of vision. He also offered to exhibit certain photographs of the location taken after this trimming, which, on objection by the plaintiff, were excluded.

It should also be noted that the plaintiff testified with commendable frankness that the driver of that team at ten feet from the track could see further towards Baltimore than when right on the tracks, and on cross-examination, after having stated in his examination in chief that one ten feet from the track could see down the track 450 feet, by his own measurement, said that if the driver had stopped ten feet from the track and had looked for the light, he should have seen it.

There were six exceptions to the rulings on evidence and one to the rulings on the prayers.

The first, second, third, fourth and fifth exceptions were taken to the action of the Court in permitting a number of the plaintiffs witnesses to testify to the operation, at indefinite periods prior to the accident, of the automatic alarm bell at the crossing and may all be considered as one exception.

The sixth exception was taken to the refusal to allow the introduction in evidence of the photographs mentioned.

The principle involved in the group of exceptions above, was considered in *Brooke* v. *Winters,* 39 Md. 509, and in *Md., Del. & Va. R. R.* v. *Brown,* 109 Md. 319, and its application has been frequently discussed in the various Courts of this country under varying circumstances. Without repeating here, we may refer to what was quoted in *R. R.* v. *Brown, Supra,* from *Wigmore on Evidence* as bearing generally upon the subject. Elliott in his work on *Evidence,* Vol 1, sec. 187, referring more directly to the precise question here involved, says, "Where it becomes necessary to

affect those charged with the duty of keeping highways, bridges or other structures in a safe condition, or of keeping only competent persons in their service, with notice of defects or unfitness, or *where the question is as to the safety or availability of a machine or contrivance designed for a particular purpose or for practical use,* evidence is admissible to show how the thing served when put to the use for which it was designed, in the one case, or that occurrences of a character to make the defect or incompetency notorious, had taken place, in the other." This rule is illustrated in the following cases among numerous others. *Brewing Co.* v. *Bauer,* 50 Ohio St. 560, where in an action for injuries to an employee while operating a lift or elevator which it was his duty to operate, evidence was admitted showing that on a prior occasion the elevator behaved in the same manner as when he was injured, as tending to show some vice in its construction, or defect in its maintenance, rendering its operation unreliable and dangerous, and that the employer knew, or should have known of this fact.

*Myers* v. *Hudson Iron Co.,* 150 Mass. 125, where evidence was held admissible of former slips of the clutch gear designed to prevent slipping, by which slipping the plaintiff was injured, said former slippings being in the knowledge of the defendant.

*Pittsburg & Fort Wayne R. W.* v. *Ruby,* 38 Ind. 111. where evidence was held admissible of particular acts of carelessness on the part of a coservant to show his retention by the master after he knew of his carelessness.

*McCarragher* v. *Rogers,* 120 N. Y. 526, where in an action for an injury by an employee, because a piece of machinery he was operating jumped out of the socket, a person previously injured at the same machine was allowed to testify that this occurred frequently during his use of it. And to the same effect are *Baker* v. *Hagey,* 177 Pa. 128, and *Perry* v. *Machine Co.,* 70 Vt. 276.

The broad principle underlying all these cases, is well stated in *Brooke* v. *Winters,* 39 Md. 508, as follows: "The

rule that excludes facts because they are collateral, does not apply to facts wherever existing if they may afford any reasonable presumption as to the matter in dispute. Whether they are facts before or after the suit, they are admissible, if they illustrate or explain the question in issue." One important qualification of this rule is that the time must not be too remote, and in this respect we think the evidence admitted, being of practically continuous behavior of the bell, comes within that requirement of the rule. It should also be noted that in all such cases, it will be presumed that the trial Court did its duty and all reasonable presumptions necessary to uphold its rulings will be indulged. 1st *Elliott on Evidence,* sec. 127; and that the matter should be regarded as in the discretion of the trial Court, unless there is plain evidence of abuse of that discretion. There is no such evidence here and there was no error in these rulings.

As to the sixth exception relating to the admissibility of photographs taken sometime after the accident and after a change of seasons, the authorities are not in harmony.

In *Dyson* v. *N. Y. & N. E. R. R.,* 57 Conn. 9, BEARDSLEY, C. J., said, "The picture represente dthe crossing in question, and its surroundings, and presumably the Court below found it was a correct representation of them. The change in the appearance of the locality by the falling of the leaves from the trees was of course open to explanation."

In *Chicago and Eastern Ill. R. R. Co.* v. *Crose,* 214 Ill. 602, the Court said, "Photographs offered in evidence to explain a transaction are only competent when they are shown to have been taken so as to correctly exemplify the actual situation, circumstances and surroundings *at the time.* When the situation and surrounding circumstances are subject to change, photographs, to be of any value as evidence, must be shown to have been taken at the time, or when the situation and surroundings are unchanged."

In the case before us certain trees which were referred to by the driver as obstructing the vision, and which were in

leaf at the time of the accident in June, had been since trimmed, though only in the tops, and there had been a fall of snow when the photograph was taken. It is not possible to lay down a general rule as to what changes shall require an exclusion of photographic representations of the locality, but the trial Court with the photographs before it, and the witness who took them, ought to be conceded some discretion in admitting or rejecting them, and we should not feel warranted in reversing this judgment upon that ground, without clear proof that injury was thereby inflicted upon the defendant .

This brings us to the rulings on the prayers.

It conclusively appears from the evidence that the automatic electric bell had been almost continuously out of order for sometime before the accident; that it could not be relied on for the purpose for which it was provided, and that this was well known to the driver at and before the time of the accident. His own evidence shows he knew that when the bell was silent this gave no assurance of safety, and that its ringing was no certain indication of danger. The situation, therefore, as to him, was the same as if a bell had never been placed there, except that his knowledge of the untrustworthiness of the bell when he heard it ringing as he approached the track and later drove on it, demanded special care and caution on his part to look and listen for the danger of which the track itself was a warning.

The defendant's third prayer, which was refused, asked that the jury be instructed "that from the uncontradicted evidence in the case, the driver of the plaintiff's wagon was guilty of negligence directly contributing to the accident complained of, and, therefore, their verdict must be for the defendant."

There is evidence strongly suggesting that he was asleep in his seat when he drove on the track, until as he expressed it, "he saw the headlight right on top of him," but he denied that he had been or was asleep, though he would not deny

that his head was down and his hands dropped. If this were the only basis of that prayer it could not be granted because that remains a disputed fact for the jury. But that is not the only, nor is it the real, basis of the prayer. The uncontradicted testimony of Mr. Layng, the draftsman of the blueprint, is that when a car coming from Baltimore is 600 feet from the crossing, the light is thrown plainly on the road on which Forrester was driving at a point 127 feet from the crossing, and the uncontradicted testimony of the plaintiff, Mr. Beasley, is that the driver when ten feet from the track should have seen the headlight itself 450 feet from the crossing as there was nothing to obstruct his view.

The driver himself testified that if the car was going to stop at the station he was sure it could not have traveled round the curve at the rate of 20 miles an hour, to the crossing, before he got over the track, and the testimony is uncontradicted that the car was going to stop at the station.

The driver says he *heard* no whistle or signal, and no noise of an approaching car, but there is no contradiction of the testimony that repeated signals were given, nor of the fact that there were two cars on in the dead of night.

It has been repeatedly held in this State that when one who can see and hear says he looked and listened, but did not see or hear an object, which if he had really looked and listened he must have seen or heard, such testimony is unworthy of consideration. *Helms' Case,* 84 Md. 515; *Medairys' Case,* 86 Md. 174; *Roming's Case,* 96 Md. 80; *Phillips' Case,* 104 Md. 458, and this is now declared in 1st *Elliott on Evidence,* sec, 127, to be the general rule. We cannot escape the conclusion that this prayer should have been granted and this renders it unnecessary to consider the rulings on any of the other prayers except those of the plaintiff, which it follows shoud have been refused.

> *Judgment reversed without awarding a new trial, costs above and below to be paid by the appellee.*