## PENNSYLVANIA RAILROAD COMPANY *vs.* CHARLES E. YINGLING.

*Railroad Crossing—Negligence—Absence of Watchman—Lessening Hours of Service—Contributory Negligence.*

Negligence is not to be imputed to a railway company from the mere circumstance that neither a bell, watchman, nor gates are maintained at a crossing.                    p. 176

If an accident occurs at a crossing, during the period of time when the company has voluntarily assumed to safeguard the crossing by a watchman or gateman, by reason of the absence of the latter, or his failure to signal or lower the gates, or any other proximate default, the failure thus to discharge an obligation voluntarily undertaken constitutes negligence.    p. 176

Where, without any demand by the public authorities, a railway company undertakes to station a watchman at a high-

way crossing, its subsequent abandonment of this self-imposed duty does not involve actionable negligence.          p. 177

The undertaking to perform a voluntary act renders the party liable if he performs it improperly, but not if he merely discontinues it.                                      p. 177

Where there was a voluntary installation by the company of a signal bell at a crossing, and for some years the voluntary addition of a watchman during certain hours of the daytime, the lessening of the hours of watchman's service at the crossing was not negligence *per se*.                    pp. 177, 178

The fact that the company for several years had a watchman stationed throughout the day at the crossing was competent evidence as to its dangerous character, and also a circumstance reflecting upon the degree of care to be expected of one approaching the crossing during the period of the watchman's performance of his duty at the crossing.          p. 178

A railroad company, which has shortened the daily hours of service of a watchman voluntarily stationed by it at a crossing, is not bound to notify every person using such crossing of the shortening of the hours.                          p. 178

One injured at a crossing *held* not entitled to claim that he was misled by the absence of a watchman at the time, this being the result of a shortening of the hours of the latter's daily service, and the person injured, as using the crossing almost daily, having had an opportunity to know of the shortening of hours of service.                          p. 178

A track is itself a warning of danger, and a public crossing is used by a traveller subject to the railroad's paramount right of way.                                      p. 179

It is negligence *per se* for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains, and this duty continues until the tracks are reached.                                  p. 179

A truck driver who, though familiar with the dangerous character of a crossing, undertook to cross without stopping at a point whence he had an unobstructed view of the track, and who, instead of looking up and down the track, listened for a bell, which he could not hear on account of the noise of the

truck, and looked for a watchman, to warn him of danger, *held* guilty of contributory negligence.                    pp. 180, 181

*Decided April 17th, 1925.*

Appeal from the Baltimore City Court (HEUISLER, J.).

Action by Charles E. Yingling against the Pennsylvania Railroad Company. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE. and WALSH, JJ.

*Charles H. Carter.* with whom were *Bernard Carter & Sons* on the brief, for the appellant.

*Robert D. Bartlett,* with whom were *William P. Cole, Jr., Bartlett, Poe & Claggett,* and *Duncan & Schwatka* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The accident in this case occurred where the public highway, known as the Beaver Dam Road, is crossed at grade near Cockeysville by three tracks of the Pennsylvania Railroad Company, running north and south, and at right angles with the highway. The approach to the crossing from the east is slightly down grade, while the crossing is level, and the highway has a down grade west of the tracks. As you approach the railroad crossing from the east, the view of the railroad to the north or right is unobstructed, but the situation is different on the left or south, which is in the direction of Baltimore. The view to the south is obstructed first by a frame dwelling facing the highway and then by a large globular shaped tree, with compact and dense foliage, whose limbs are close to the surface of a slight embankment along the railway. The trunk of the tree is off the appellant's right of way and about twenty-four feet from the nearest rail of

the tracks. The house, the tree, with its low hanging branches, and some bushes, shut out the view to the south completely until the line of sight cleared the western outlines of the tree.

The appellee testified that he could not obtain a view of the track to the south from his truck until he was at a point in the roadway ten feet from the east rail of the north-bound track, which would put the front of the truck wheels five feet away from this rail. It does not appear that the appellee made any actual measurements, and other witnesses estimated this distance to be fifteen or eighteen feet. A photograph taken at fifteen feet escapes the obstruction of the view, but at sixteen feet the view is shut out. As the lens of the camera is not as high from the ground as the eyes of the truck driver, it is quite probable that the true distance is not quite fifteen feet, because of the rounded contour of the tree, although the engineer estimated the distance of the truck from the crossing, when he first saw it coming from behind the tree, as fifteen feet.

It was a dangerous crossing, and for many years an electric crossing bell or gong had signaled a warning for the approaching train. This bell was of the standard type, twelve inches in diameter, and was at the top of an upright metal piece from seven to eight feet high, which was located on the west side of the tracks and near the south line of the highway, and forty feet from the east rail of the north-bound track. In addition to the bell, the appellant had for some years provided two watchmen, who had a watchman's box along the side of the crossing bell. At the approach of a train the bell would sound, and the watchman, during the period of his duty, would step out in the highway with his warning sign. He would not be in the roadway unless a train was approaching. The watchmen were on duty at the crossing only during the day time, and, until June 25th, 1921, one began at six o'clock in the morning, and a watchman was kept on duty continuously until the same hour in the afternoon. The appellant, with the closing of the schools,

relieved one of the watchmen, who was on duty from two to six o'clock, and kept the other watchman, whose new hours were from half-past seven in the morning to half-past three in the afternoon. This change took place on June 25th, 1921, and was in operation on the day of the accident. The testimony was that the effect of this change was to have the watchman on duty during those hours when the train movement was heaviest. The change increased by four hours the period during which the bell was the sole method of warning. The bell started to ring for a north-bound train when it was thirty-five hundred feet from the crossing, and did not stop ringing until the rear end of the train had cleared the crossing.

The accident happened on July 14th, 1921, at about quarter of five in the afternoon. The express train, known as the Chicago Limited, made up of engine, tender and four coaches, was traveling on schedule time, at about thirty-eight miles an hour, and had reached a point about seventy or eighty feet from the crossing, when the engineer saw the appellee drive from behind the tree towards the Beaver Dam crossing. The engineer applied the brakes, but, of course, the train could not be stopped in time, and the right front corner of the pilot bumper struck the truck at the front wheel. The air brake on the engine was released because the collision had broken off some of the air pipes on the engine, but the brake on the cars was not affected, and the train was stopped, but not so quickly. The pilot was torn loose from the engine, letting the cowcatcher drop on the track. The appellee was injured, and he was picked up unconscious, seventy-five or eighty feet north of the crossing.

As the regulations of the appellant did not require it, the whistle was not blown for the crossing, but the trainmen testified that the engine bell was rung, although neither the appellee nor any other witnesses heard it. There is no question, however, that the crossing bell was in good working order, and rang the alarm for the approaching train. The appellee testified that he did not hear the ringing of the bell,

and attributed his failure to the noise made by the movement of his heavy truck, with side boards, over the rough surface of the road.

The appellee, Charles E. Yingling, forty-seven years of age, was born in the neighborhood of the crossing and had been familiar with it for thirty years, having traveled over it frequently. He was employed by the Beaver Dam Quarry Company as a motor truck driver, and had been running a truck, back and forth, over this crossing nearly every day for almost four years before the accident. On some days he used the crossing two or three times daily. He knew that the crossing bell was there, and for what purpose, and knew it worked. All of the material circumstances have been stated except the appellee's own description of the accident, which will now be given.

The plaintiff was driving a five-ton Packard truck westward along the Beaver Dam Road on July 14th, 1921. He stopped at the entrance of York Road, which was three hundred feet east of the crossing, and then started forward. He took the emergency off his truck, and let it drift down the slight grade to the crossing. He described the accident in this way: "I was just looking out, looking and listening for the bell, and I was looking for the watchman, and I just pulled my emergency brake up every once in a while, just going slow, almost creeping along. I was not going over three miles an hour. I will testify to that on a stack of Bibles as big as this building, and I was holding my emergency, just going slow as I could. I looked for the watchman and seen no watchman. I thought everything was all right; there was no watchman there, no watchman out. I thought to myself, well, he is in the box. I just took the reverse brake off—the emergency brake off, and just kept on drifting. That is the last I knowed. I never knowed no more until I woke up in the hospital."

To the question what was he looking for, this answer and testimony was given: "A. Looking for the watchman and listening for the bell. You could not look south of the

Beaver Dam Road down the railroad track on account of the house and the tree. The tree is so thick and hung so low there that you practically had to get within say four or five feet of the railroad track. I was sitting five feet behind my wheels in the truck, and that throwed the wheels five feet ahead of me, when I was about, I suppose, pretty near on the track, before I could myself see down the track. Q. You say you were looking. Do you mean you were looking up and down the track? A. No, sir; I was looking for the watchman. I knowed the watchman was always there, and I knowed when the watchman was not out with his stop stick everything was clear, and I listened for the bell and heard nothing; could not hear a thing. (The Court): Where was the bell? (The Witness): That bell, your Honor, is on the opposite side, the west side of the railroad track, and I was on the east side of the railroad track. There are three tracks there between the west side and the east side. You see, that is a right good distance for the bell to be away over here, and I was away over there, and I suppose the noise of the train and the noise of the truck, you cannot hear a thing, you cannot hear the bell on the east side of the track with a touring car, and that don't make near the noise that a truck does going over rough roads. * * * Q. (by Mr. Schwatka): Did you hear or see a train coming on this particular trip? A. No, sir."

The appellee closed his testimony by stating that he was moving so slowly towards the crossing that he could have stopped the truck in eight feet.

The verdict was in favor of the appellee for twenty-five hundred dollars, and from the judgment on this verdict the Pennsylvania Railroad Company has appealed. There is only one exception, and it is to the action of the lower court on the prayers.

The appellee's theory was that the removal of the crossing watchman, under the circumstances narrated, without the appellee's knowledge, made the watchman's regular absence equivalent to an invitation by the railroad company to the

appellee to cross under an assurance of safety. The sound-
ness of this contention is the principal question on this ap-
peal, which presents a record whose facts distinguish it from
*Balto. & O. R. R. Co. v. Windsor,* 146 Md. 429, where the
negligence was the failure of a crossing bell to ring in ad-
vance of the approach of the train, and from *Northern Cen-
tral Ry. Co. v. Gilmore,* 100 Md. 404; *Balto. & O. R. R. Co.
v. Hendricks,* 104 Md. 76; *McAdoo v. State,* 136 Md. 452;
*Pennsylvania R. R. Co. v. State,* 135 Md. 496, where there
was a failure of duty in the operation of the gates by the
agents of the defendants; and from *Jenkins v. Balto, & O.
R. R. Co.,* 98 Md. 402, and *Balto. & O. Ry. Co. vs. Stumpf,*
97 Md. 78, where the gates were up and the operator absent,
although the public local law of Baltimore city required
that the gates be maintained at all hours of the day and night.

It is well settled in our State that negligence is not to be
imputed to a railway company from the mere circumstance
that there was neither bell, watchman nor gates maintained
at the crossing. *State, use of Foy, v. Phila. etc. Ry. Co.,*
47 Md. 85; *North. Cent. Ry. Co. v. Medairy,* 86 Md. 175;
*Cowen v. Deitrick,* 101 Md. 49; *Evans v. Balto., C. & A.
Ry. Co.,* 133 Md. 34. So, in *Balto. & O. R. R. Co. v.
Roming,* 96 Md. 67, where the defendant voluntarily main-
tained a gate at the crossing, which was operated by the
gateman only during the day, this Court did not hold it
negligence that the gate was raised and left open at night,
although it was then that the accident happened. And again,
in *Balto. & O. R. R. Co. v. Newton,* 137 Md. 21, negligence
was not imputed to the defendant, although there was a watch-
man's box at the crossing and a watchman during the day,
but none at night, when the collision occurred. If the acci-
dent, however, had taken place during the period of time
when the defendant had voluntarily assumed to safeguard the
crossing by a watchman or gateman, through the failure of
the watchman or gateman to discharge his duty by reason of
his absence, failure to signal or to lower the gates, or of any
other proximate default, there can be no question that the

failure thus to discharge an obligation voluntarily assumed
would have been negligence on the part of the company, as
is illustrated by the cases cited by the appellee. *Chicago &
Alton Ry. Co. v. Wright,* 120 Ill. App. 218; *Lockridge v.
Railway Co.,* 161 Iowa 86; *Roby v. Kansas etc. Ry. Co.,*
130 La. 879; *Sights v. Louisville etc. Ry. Co.,* 117 Ky. 436;
*Dolph v. N. Y. etc. Ry.,* 74 Conn. 538; *Chicago & Alton Ry.
Co. v. Blaul,* 175 Ill. 183; *McAdoo v. State,* 136 Md. 452;
*Ernst v. Hudson River R. R. Co.,* 39 N. Y. 61, 65.

The law imposes on the appellant the duty of giving timely
warning of the approach of its trains to a highway crossing,
but it does not require of the railroad company that it station
a watchman at a public railway grade crossing in the country
unless as a result of a demand by the county commissioners
of the county where the crossing is situated. (*Code,* art. 23,
sec. 240.) The abandonment, in whole or in part, of this
self-imposed duty as a result of a change of policy, is not of
itself actionable negligence. The undertaking to perform a
voluntary act renders the party liable if he performs it im-
properly, but not if he merely discontinues the act. 1
*Beven's Negligence in Law* (3rd Ed), 63; *McGrath v. N.
Y. etc. Ry. Co.,* 59 N. Y. 468, 472; *Shelton v. London &
Northwestern Railway Co.,* L. R. 2 C. P. 631, 636, and
cases cited.

It would seem, therefore, that where there was a voluntary
installation of a signal bell at the crossing, and for some
years the voluntary addition of a watchman during certain
hours of the day time, the lessening of the hours of watch-
man's service at the crossing, as in the instant case, was a
matter entirely in the control of the defendant, and was not
*per se* an act of negligence, but rather indicative, as was
said in *Giacomo v. New York etc. Ry. Co.,* 169 Mass. 192,
that such precautions were not necessary. Taking the watch-
man off duty from half-past three in the afternoon was not
of itself a breach of duty. The warning of the approach of
trains was still given by the customary signals from the en-
gine, and by the alarm sounded by the ringing of the crossing

bell. The shortening of the watchman's period of signaling was merely a change in the daily habit of the defendant with respect to the crossing.

While the appellee relied chiefly on the fact that for several years it had been the custom of the appellant to have a watchman stationed at the crossing from six o'clock in the morning until six o'clock in the afternoon, and while this was competent evidence relative to the dangerous nature of the crossing and also, a circumstance to reflect upon the degree of care to be expected of a traveler approaching the crossing with this knowledge and during the period of the watchman's performance of his duty at the crossing, yet, if the absence of the watchman at the time of the accident was due to a regular decrease of his hours of daily duty at the crossing, his failure to be there was not of itself negligence.

As has been said, the appellee worked in the neighborhood of the crossing, and drove his truck over it so often as to average once daily; and the watchman had not been on duty after half-past three in the afternoon since June 25th, 1921, and the accident was on July 14th, when the change was in the twentieth day of its operation. The law did not impose upon the appellant the obligation to give to every traveler on the highway personal notice of its shortening the hours of the watchman's service. Nor had the modification in the appellant's habit been so recent as to retain any quality of surprise or of entrapment at the time of the accident. The regular and continuous withdrawal of the watchman from his post from half-past three in the afternoon for so many days was a daily and practical notification of the change to the public using the crossing. If the appellee did not discover this change during this period of opportunity, in which he frequently drove over the crossing, it was through no breach of duty from the appellant to him, and from no lack of the means of obtaining the information. Under the circumstances, the Court cannot say that the appellee had the right to infer that the watchman's absence

was an assurance of safety or that it left him at liberty to neglect to use his eyes and ears for his own protection.

The track was itself a warning of danger to the appellee, and the public crossing was used by the traveler subject to the railroad's paramount right of way. *Md. Elec. Ry. Co. v. Beasley,* 117 Md. 278; *Phila., W. & B. R. R. Co. v. Hogeland,* 66 Md. 149. By reason of the obstruction on the south of the highway, it was all the more incumbent on the appellee to be prudent  The recognized rule in this State is that it is negligence *per se* for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains, and that this duty continues until the tracks are reached.  If the view of the track is not fully in view in both directions in the immediate approach to the crossing due care would require that the party intending to cross the railroad tracks should stop, look and listen before attempting to cross.  As was said by 'Judge Alvey in *Phila., W. & B. R. R. Co. v. Hogeland,* 66 Md. 160.  "Especially is this required where a party is 'approaching such crossing in a vehicle the noise from which may prevent the approach of a train being heard.  And if a party neglects 'these necessary precautions and receives injury by collision with a passing train which might have been seen if he had looked, or heard if he had listened, he will be presumed to have contributed by his own negligence to the occurrence of the accident; and unless such presumption be repelled he will not be entitled to recover for any injury he may have sustained. ' This is the established rule and one that the courts ought not to relax, as its enforcement is necessary as well for the safety of those who travel in railroad trains as those who travel on the common highways." *Balto. & O. R. R. Co. v. Roming,* 96 Md. 67; *Balto. & O. R. R. Co. v. Newton,* 137 Md. 21; *State v.. Wash. etc. Ry. Co.,* 145 Md. 285; *Glick v. Cumb. etc. Ry. Co.,* 124 Md. 112; *McAdoo v. State,* 136 'Md. 464, 465; *North. Cent. Ry. Co. v. Gilmore,* 100 Md. 414; *North. Cent. Ry. Co. v. Medairy,* 86 Md. 173; *Cullen v. New York etc. Ry.,* 127 Md. 652; *Brehm v. Phila. etc. Ry. Co.,* 114 Md.

314; *State, use of Stumpf, v. Balto. etc. Ry.*, 133 Md. 411, 414, 415; *O'Meary v. Balto. etc. Ry.*, 133 Md. 507, 508.

The appellee was an experienced driver of an automobile, and his constant use of the crossing throughout a period of four years made him entirely familiar with its dangerous nature and the perils attendant upon its passage. He was aware that the danger to him was in the movement of the north-bound trains on the east tracks. Through many experiences he knew at what point in the roadway he could obtain an uninterrupted view southward of a straight railroad track for a distance of between three-fourths of a mile and a mile. By his own proof he could not see this stretch of track until the front wheels of the truck were five feet from the easternmost rail of the north-bound track, which would mean that he was ten feet distant from the same rail. He knew that by stopping at this point he was at once in a position of absolute safety and where he could obtain positive assurance of a safe crossing by simply looking. His truck was moving at the very slow rate of not over three miles an hour, and he had it under such complete control that he could have stopped the truck in eight feet. And his own testimony was that he could not hear the ringing of the bell because of the noise made by the movement of his heavy truck and rattling sideboards. When he reached the obstruction he did not stop the truck, nor did he stop after the obstruction was passed, although there was the usual warning sign before him to stop, look and listen. It was broad daylight, and he was in full possession of his faculties, with every opportunity and reason, and under the legal duty, to use them.

It would have been only the conduct of a reasonably prudent man to have stopped, looked and listened where he could have seen or heard an approaching train. He did not even look up or down the track, as could have been done in the glance of an eye after he had passed the line of the tree which obstructed the view. He went ahead without pause or stop. He was asked: "You say you were looking. Do you

mean you were looking up and down the track? A. No, sir. I was looking for the watchman. I knowed the watchman was always there, and I knowed when the watchman was not out with his stop stick everything was clear, and I listened for the bell and heard nothing; could not hear a thing."

In other words, he ignored the possibility of the watchman's temporary absence through either accident, sickness or necessity, as well as through having been regularly withdrawn during the period of the day on which he was using the crossing, and he did not look for an approaching train, but listened for the bell which, on his own testimony, he could not hear. But he did not even hear the approach of the fast train, and, notwithstanding its noisy oncoming, the train struck the truck and knocked him into a state of insensibility before he either saw or heard the train.

The reason he did not see the train was that he did not look. If he had said he had looked as he approached the crossing and did not see, he could not be believed. And when he admits he did not look, when, if he had, he could have stopped in time to have avoided the accident, he cannot recover because his own negligence directly contributed to the happening of the accident. A man in the full possession of his faculties cannot drive, without even looking, in front of a rapidly approaching train and recover. With the increasing number and size and weight of motor trucks, there is a greater necessity now than ever before that this rule be not relaxed, but strictly enforced for the safety of those who travel in train and on the highways. *Balto. & O. R. R. Co. v. Newton,* 137 Md. 21, 23.

In the view taken by the Court there was error in the refusal of the lower court to grant appellant's prayer taking the case from the jury, so it will not be necessary to consider the other prayers. The judgment will be reversed without awarding a new trial.

> *Judgment reversed, without awarding a new trial, the appellee to pay the costs.*