## THE BALTIMORE AND OHIO RAILROAD CO. *vs.* STATE, USE OF JULIA ROMING ET AL.

*Negligence—Accident at Railway Crossing—Sufficiency of Evidence—
Contributory Negligence.*

Plaintiff's deceased was seen about ten o'clock at night driving in a
wagon at a slow trot on a country road towards defendant's railway
tracks.   He was a young man whose sight and hearing were good and
he was well acquainted with the locality.   When he was within 50 feet
of the tracks a train coming from the direction the one came which

caused his death was visible at a distance of about 1200 feet and when on the track such a train was visible for 575 feet. At that distance the tracks ran through a cut under a bridge and curved thence away. The only eye witness of the accident was the engineer of the train who testified that when within an engine length of the crossing he saw a horse trying to go across; that he at once applied the brake and blew a danger whistle, but it was too late to avoid a collision; that the train was stopped within its own length and the deceased found under the tender which had dragged him along after being struck. The speed of the train was then 15 to 18 miles an hour, but it had been running at the rate of sixty miles an hour. There was a station and a block signal a short distance beyond the crossing and the engineer testified that his rule was to blow a long blast for the signal when about one hundred yards from the bridge and as he went into the cut towards the bridge and saw the signal to respond by two short blasts of the whistle, and that both of these signals were given on the night of the accident before it happened. This evidence as to the whistles was corroborated by the fireman and conductor of the train and the operator at the signal tower. Plaintiff's witnesses, who lived in the vicinity, testified that they did not hear any whistle before the danger whistle given at the time of the collision. The deceased had been slightly under the influence of liquor during the evening, but was not unable to take care of himself. *Held*, that the case should have been withdrawn from the jury because not only was there no legally sufficient evidence of any negligence on the part of the defendant directly contributing to the collision, but there is evidence that the deceased could have seen or heard the train in time to avoid the injury, and his contributory negligence was such as to preclude a recovery.

Appeal from the Baltimore City Court (SHARP, J.), where there was a judgment for the plaintiffs for $15,000.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*W. Irvine Cross* and *Edward T. Noble* (with whom was *H. L. Bond, Jr.*, on the brief), for the appellant.

Plaintiff claims that the whistle was not blown at or above the bridge. As the engineer depended on this whistle to get his target changed, and as it was changed, it would seem most likely that it was blown. There is no evidence that it was not blown. Two witnesses for the plaintiff testify *that they did not hear it blow* —Philip and David Sykes. Neither of them testifies that it did not blow; nor does it appear that either of

them was listening.   Neither of them heard or saw the train at all till they heard the crash of the collision.   The distance from the Sykes house to the point where the engineman testified that he blew the signal for the target the first time, is over half a mile, and from the point where he blew the second time under the bridge, is over a quarter of a mile.   Those signals were of frequent occurrence at that point.   Both testified that they heard the danger signal.   The reason they heard the one and not the other is easily reconcilable with common experience.   " The long whistle which is used in approaching a station is so common upon a leading railroad line that persons living in the vicinity, and especially near a crossing, may hear it many times during the course of the day.   It is so frequent that they may not notice it.   It conveys no meaning beyond the fact that a train is approaching a station or crossing, but when the shrill warning signal is given by two or more sharp blasts, it is likely to attract the attention of the persons in the vicinity."   *Urias* v. *Pennsylvania R. R.*, 152 Pa. 326.

So in this case.   The plaintiff's witnesses do not testify that the whistle was not blown, but *that they did not hear it.*   This is contradicted by five witnesses of the defendant who state positively that the whistle was blown as the engineer testified, and the corroborating circumstance that such a signal was necessary in the working of the block signal system on the railroad.   In *Hauser* v. *The Central Railroad,* 147 Penn. 440, the Court said : "The testimony of the plaintiff alone that she did not hear any whistle or bell, as against the positive evidence of six other witnesses who did hear, is merely a scintilla of negligence which is not enough to send the case to the jury."   See also *Horn* v. *The B. & O. R. R. Co.*, 54 Fed. 301; *Stitt* v. *Huidekopers*, 17 Wall. 393.

The uncontradicted evidence is that the signal was blown, but if it were not, there is not the faintest proof that such failure had anything to do with the accident.

It was shown that the train on the night in question was some 12 to 15 minutes behind time, but this fact is no evidence whatever of negligence.   *Annapolis Short Line R. R.* v. *Pumphrey,* 72 Md. 82.

There is manifestly an attempt on the part of the plaintiff to show that the train crossed the crossing at an excessive rate of speed, but plaintiff has no positive testimony on this point, and endeavors to prove his contention by the defendant's engineer. Testimony given on the direct examination by the engineer, namely, that he was running in the neighborhood of from 15 to 18 miles an hour ; was going to stop at the station ; was approaching the station with the train under reasonable control, could not possibly have avoided the accident after he saw the horse on the track, and stopped the train within its length (five cars and the engine)—a good stop —is uncontradicted and must stand. It is not sufficient to sustain a verdict that the plaintiff should show that the accident happened and, *as separate and unconnected facts*, show acts of negligence on the part of defendant. It must be shown that there was an act or acts of negligence by the defendant that directly caused the accident—an act that will explain why deceased was killed in spite of his exercising ordinary care.

Under the facts in this case, it was the duty of the plaintiff to prove, not only the negligence of the defendant, but that such negligence was the proximate cause of the accident, or at least in some way to connect the said negligence with the accident, and in this respect the plaintiff's second prayer was improperly granted. The facts in this case are peculiar. The testimony shows the knowledge by certain witnesses of definite things which the defendant did and did not do. There has been an attempt to place these acts of the defendant in such a light as to charge negligence on its part, but there is no testimony on the part of the witnesses of either the plaintiff or defendant which will show one act of the deceased, either of ordinary caution or negligence in attempting to cross the tracks. There was evidence offered by the defendant from which a reasonable inference as to the conduct of the deceased could be drawn, but in this case the plaintiff stands almost in the same position as the plaintiffs in the cases of *State, use of Miller* v. *The Baltimore and Ohio Railroad,* 58 Md. 228; *N.*

*C. R. R. Co.* v. *State, use of Burns,* 54 Md. 113, and *State, use of Allison* v. *The Baltimore and Ohio Railroad,* 62 Md. 479, where the dead bodies were found near the defendant's tracks, and there was no evidence whatever as to how the accident happened. In all three cases above recovery was denied. No one saw this accident except the engineer, who swears the wagon appeared on the track so close to the engine that it was absolutely impossible for him to avoid striking it. This Court has repeatedly said in cases of this character that when the plaintiff charges the defendant with negligence, it must also show that that negligence was the proximate cause of the injury, or that the plaintiff used all the precautions for his safety which an ordinary person would use under like circumstances. *P., W. & B. R. R. Co.* v. *Stebbins,* 62 Md. 517; *C. & P. R. Co.* v. *Millslagle,* 73 Md. 74; *Barnard's case,* 60 Md. 555; *Cowen* v. *Watson,* 91 Md. 344.

*William S. Bryan, Jr.,* and *Edwin Burgess,* for the appellee.

The evidence shows that the deceased was slowly driving towards the public crossing over the railroad track a little after *10 o'clock* at night. The time had elapsed for the passing of the train, and he had no reason to expect its coming. To reach the crossing he was obliged to go up a hill, and then descend it. There was a curve in the county road just before it reached the crossing. There was a bridge over the railroad at a distance from the crossing variously estimated at from one hundred yards to five hundred and seventy-five feet. This bridge is over a deep cut in which the railroad track runs; there are woods and high banks on each side of the railroad as it leaves the bridge. The ground rises east of the crossing until it reaches the bridge. The road curves between the crossing and the bridge and a good deal more after you pass the bridge going from the crossing. The Messrs. Sykes saw the deceased as he passed their house. Philip Sykes kept sight of him when he went up the hill and when he went down the hill, and until he came to the curve in the road. He was then almost at a standstill, and about four

yards from the track.    From the situation of the Sykes house
(being on a hill), the Sykeses could see up the railroad cut to
the bridge.    When the deceased turned the curve about four
yards from the crossing there was no train in sight.    Within
the shortest conceivable time afterwards, they heard a great
crash and the blowing of a danger whistle.    The crash and
the whistle came about the same time ; they heard the crash
first and then the whistle.    Before the crash they heard no
whistle, and no ringing of bells.    The duty of the persons in
charge of a railroad when approaching a *public* crossing is to
give sufficient signals of their approach.    *Neubeur's case*, 62
Md. 396; *Seever's case*, 70 Md. 72; *B. & O. R. Co.* v. *Owings*,
65 Md. 511.

And in other jurisdictions the law is laid down with equal
emphasis, that it is negligence for a railway train to fail to give
warning of its approach to a public crossing.    Said the Su-
preme Court in *Continental Improvement Co.* v. *Stead*, 95 U.
S. 164 : "The train has the preference and right of way.    But
it is *bound to give due warning of its approach,* so that the
wagon may stop and allow it to pass, and to use every exer-
tion to stop if the wagon is inevitably in the way.    *Such warn-
ings must be reasonable and timely.*"    Said the Supreme Court
of Illinois in *C. & A. R. R.* v. *Landers*, 154 Illinois, 536 :
"In *C. & A. R. R.* v. *Dillon*, 123 Ill. 570, we said : 'Without
regard to the statute, it is the duty of those having charge of
trains to give notice of their approach *at all points of known
or apprehended danger.*'"    See, also—*L. & N. R. R.* v. *Clark's
Adm.*, 105 Kentucky, 581; *Lesan* v. *Maine Central R. R.*, 77
Maine, 89; *R. R.* v. *Converse*, 139 U. S. 469.

The facts show that defendant was guilty of negligence.
The testimony for the plaintiff shows that no notice whatever
was given of the approach of the train.    The engineer says
that he did not leave Camden Station on time (he does not
say how much behind time he was).    He was at least twelve
minutes late at Annapolis Junction.    He had probably been
attempting to make up the lost time.    But even if this were
not the case, his "actual running time out in the country

would not be quite sixty miles an hour." Lee, the conductor, says that when he was a little east of the bridge, "he was probable running between fifty and sixty miles an hour." "When he got to the bridge he was running fifty or sixty miles an hour." If he was running sixty miles an hour it was a mile a minute.

According to the testimony of David Sykes, the crossing was a hundred yards (300 feet) from the bridge. It would take the train at this rate about three and a-third seconds to reach the crossing, as a simple calculation will show. A mile is 5,280 feet; this distance a minute would be 88 feet a second; and four seconds would carry the train 342 feet. And this calculation will show that it was almost impossible to see or hear the train before it reached the crossing. The defendant's testimony stated that the crossing was 575 feet from the bridge. On this estimate it would take a train less than seven seconds to cover the distance. If we assume that the speed of the train was slackened, the time for reaching the crossing would be proportionately increased. But two credible witnesses swear that the blowing of the whistle was simultaneous with the crash at the crossing, and this testimony agrees perfectly with the undiminished speed of the train. The deceased was seen at almost a standstill, about four yards from the track, when he was turning the curve. He could not see the bridge from that point. If he looked up the track the train was not in sight. As he got upon the track the train without signal or warning reached a point where it could have been seen by day, and was upon him in a very few seconds, we may say instantaneously. The extremely short space of time that intervened was not sufficient to enable the deceased to escape. It would be very unreasonable to allege that he was guilty of negligence.

It is settled that " the want of ordinary care on the part of the party injured is matter of defense, and the *onus* of proof of the fact is upon the defendant." And in considering the facts the question of ordinary care on the part of the party injured " is not to be determined in an abstract way, but relatively, as

it may be connected with and dependent upon the duty and obligation of the defendant." *B. & O. R. R. Co.* v. *State, use of Hauer,* 60 Md. 462; *Frech* v. *P., W. & B. R. Co.,* 39 Md. 576.

.. That Roming did stop, look and listen would in the absence of proof on the subject be inferred from the known disposition of all men to keep out-of difficulty and danger. This presumption can always be invoked where there is no affirmative proof the one way or the other on the point. *Md. Central Railway* v. *Neubeur,* 62 Md. 402.

.·The best and most conservative Courts in other jurisdictions have applied this presumption in the very case of persons who have been killed at public crossings. *Schum* v. *Pennsylvania R. R. Co.,* 107 Pa. St. 12; *Continental, &c., Co.* v. *Stead,* 95 U. S. 165; *B. & O. R. Co.* v. *Griffith,* 159 U. S. 608; *T. & P. R. Co.* v. *Cody,* 166 U. S. 614.

. ..Schmucker, J., delivered the opinion of the Court.

The equitable appellees are the widow and children of John C. Roming who was struck and killed by a passenger train of the appellant at a grade crossing near Annapolis Junction. The suit was brought for their use to recover damages for the loss of his life which the declaration alleged was caused by the negligence of the servants of the appellant. The verdict and judgment were against the defendant and it appealed.

There are several exceptions in the record to the rulings of the Court below, but the substantial issue in the case is presented by the rejection of the defendant's first and second .prayers offered at the close of·the evidence. The first prayer asked the Court to take the case from the jury for want of evidence legally sufficient to show that Roming's death had been directly caused by the negligence of the defendant or its agents. The second prayer instructed the jury to find for the defendant, because by the undisputed evidence the negligence of Roming directly contributed to the accident which caused his death.

A plat of the location of the accident made from actual·

measurements was used by agreement, as if it were part of the record, at the hearing of the case. From this plat and the testimony of the witness, Zepp, who made the measurements it appears that at the crossing where the accident occurred and for some distance on each side of it the railroad tracks run east and west by a uniform curve northerly of thirty minutes. The railroad has two tracks and there is a switch on the south side of the main tracks thus making three tracks in all which the public road crosses at grade. Annapolis Junction station is a little over one hundred yards west of the crossing. At the distance of nearly two hundred yards east of the crossing a county road passes over the railroad by an overhead bridge of a single span having a clear width of fifty feet between its abutments. From the crossing to the bridge the view is un-obstructed, but east of the bridge the railroad runs through a cut of such depth as to conceal a train of cars from the view of a person standing at the crossing, except in so far as the curve in the tracks permits it to be seen by looking underneath the bridge. The railroad company voluntarily maintains a gate at the crossing which is operated by a gateman during the day, but is left open at night.

The public road by which Roming was attempting to cross the tracks when he was killed runs a short distance south of and nearly parallel to the railroad until it reaches the crossing where it turns north by almost a right angle and crosses the tracks. Roming at the time of the accident had been going east on this road until he reached the crossing when he turned north across the railroad. The train by which he was struck was coming west toward him on its way from Baltimore to Washington.

The witness, Zepp, testified that by actual measurement the distance from the grade crossing to the overhead bridge was 575 feet. He further testified that in approaching the crossing from the south by the road on which Roming travelled, he could, when 50 feet south of the centre line between the tracks, by looking easterly under the overhead bridge, see a man standing in the centre of the west-bound track 1,275 feet

distant, that when 45 feet south of the centre of the tracks he could see him 1,245 feet off, that when 35 feet south of the centre of the tracks he could see him 1,150 feet off, and when 25 feet south of the centre line of the tracks he could see him 1,115 feet off. He further testified, though not from actual measurement, that he was positive that one standing midway between the tracks at the crossing could see the west-bound track at least 250 feet beyond the bridge and that when standing there he had in fact seen trains approaching from the east at that distance beyond the bridge. There was no direct contradiction of this testimony although other witnesses expressed the opinion that the distance from the crossing to the bridge was somewhat less than Zepp's measurement made it, and that a west-bound train could not be seen by one standing at the crossing until it reached the bridge.

The accident by which Roming lost his life occurred at about quarter past ten o'clock at night. No one saw the actual collision between the train and the wagon in which he was riding. J. W. Furley the engineer of the train testified that as he approached the crossing he was standing in his usual place in the right hand side of the engine cab looking forward and when, within an engine length of the crossing, he saw a horse trying to cross the track, and that he at once pulled the whistle with one hand and applied the brake with the other hand. That he stopped the train, five cars and the engine, within its own length and went forward and found Roming under the tender which had dragged him along after he was struck. That the train was running from fifteen to eighteen miles an hour at the time and nothing could have been done to save Roming after the horse was seen.

The engineer further testified that when approaching Annapolis Junction from the east he is in the habit of blowing a long blast for the block signal at the station when about one hundred yards east of the bridge. Then as he goes into the cut toward the bridge he sees the block signal and responds at once by two short blasts of the whistle to notify the signal man that he has seen the signal. That he blew all of these

blasts of his whistle at the usual places on the night of the accident, and also blew the danger signal as soon as possible after seeing the horse on the track in front of him.   That out in the open country his train runs fifty to sixty miles an hour, but as he approached the junction on that night he had his train somewhat under control as he expected to be signalled to stop there for passengers and was looking out for that signal as well as for the block signal.

The fireman and the conductor on the train and the night operator at the signal tower all corroborated the engineer's testimony as to blowing the long blast of his whistle before reaching the bridge and subsequently the two short blasts in response to the block signal.   Bertha McCauley who was waiting at the station, heard the long blast of the whistle when, as she said, the engine was coming under the bridge and also the short blasts which followed.   The fireman also testified that he began to ring the bell at the sounding of the long blast of the whistle and continued to ring it as they approached the station.

There is no contradiction of this testimony as to the giving of the usual signals from the train as it approached the crossing except that of David Sykes and his son Philip, who lived a short distance west of the station and they only testified that they heard no whistle or bell prior to the danger signal which they said came simultaneously with the crash of the collision. Bertha McCauley also said that "she never noticed the bell."

Charles A. Murphy testified that Roming called at his mill about three o'clock on the afternoon of the accident and that "He was under the influence of liquor to a certain extent, so any person could easily tell it, but not drunk enough not to know that he wanted to buy chop and to pay for it."  George Diven who keeps a saloon at Laurel, testified that Roming was at his saloon on that afternoon and left about seven o'clock, that he drank six glasses of beer while there and took away a dozen beers in his wagon, but that "he seemed to be able to take care of himself and knew what he was doing when he left."   Richard Whitehead testified that Roming on that even-

ing drove him from Diven's saloon to his home about half way between Laurel and Annapolis Junction and remained there until half-past eight o'clock and further said "It looked to me like Roming was able to take care of himself, he was sober then I suppose."

Nothing further was seen of Roming by any of the witnesses until about ten o'clock or shortly after when he was seen by David Sykes and his son Philip to pass their house in his wagon going east on the public road which crosses the railroad at the place of the accident. The Skyes house stands a short distance west of the railroad station. Roming passed the house at a gentle trot and he was seen by Philip Sykes until his wagon turned north into the railroad crossing and got nearly on the track, not more than four yards distant, when it was concealed from view by a coal bin standing there. This witness further testified that when he thus lost sight of the end of Roming's wagon it was "almost at a standstill like" and that although the witness was then looking east right down toward the overhead bridge and the cut beyond it no train whatever was in sight.

It further appears from the uncontradicted testimony that Roming lived near Annapolis Junction and often came there and was familiar with the whole local situation and that he was a strong and healthy young man and had good sight and hearing.

The mutual and reciprocal obligations of railroad companies and travellers about to cross their tracks on public highways have been clearly defined by numerous decisions in this State. The recognized doctrine upon the subject was well stated in *P., W. & B. R. R.* v. *Hoagland*, 66 Md. 160–161 as follows : "The railroad trains from the nature of things have the precedence of passing the crossing of public ways unobstructed ; but it is the duty of those directing the trains to be careful to give all proper and sufficient signals of their approach and to take all reasonable precaution in view of the nature of the crossings to avoid collision. Failure in the strict performance of these duties to the public, whereby in-

jury is inflicted upon individuals will subject the company to liability to respond in damages to the injured party. But while such is the plain duty of the managers of railroad trains it is equally the duty of those approaching the crossings as travellers upon highways, to approach with care, and the more difficult and dangerous the crossing the greater the care required. The rule is now firmly established in this State as it is elsewhere that it is negligence *per se* for any person to attempt to cross tracks of a railroad without first looking and listening for approaching trains ; and if the track in both directions is not fully in view in the immediate approach to the point of intersection of the roads due care would require that the party wishing to cross the railroad track should stop, look and listen before attempting to cross. Especially is this required where a party is approaching such crossing in a vehicle the noise from which may prevent the approach of a train being heard. And if a party neglect these necessary precautions and receives injury by collision with a passing train which might have been seen if he had looked or heard if he had listened he will be presumed to have contributed by his own negligence to the occurrence of the accident ; and unless such presumption be repelled he will not be entitled to recover for any injury he may have sustained. This is the established rule and one that the Courts ought not to relax as its enforcement is necessary as well for the safety of those who travel in railroad trains as those who travel on the common highways."

*Hoagland's case* has been cited with approval and relied on in numerous cases and has been affirmed as recently as in *Holden's case*, 93 Md. 420, and *McNab's case*, 94 Md. 726. In *Watson's case*, 91 Md. 354, the Court said it will not do for tha plaintiff to say that he looked and did not see or listened and did not hear the train when the facts of the case show that if he had looked or listened with the requisite care or caution he must have seen or heard it.

Tested by these authorities it must be presumed that Roming's own negligence directly contributed to the accident which caused his death. The uncontradicted evidence shows that

when he had turned into the crossing and almost reached the tracks no train was in sight.   When the train did in fact come he could have seen the headlight of the locomotive at a distance sufficiently great to have enabled him to avoid the collision by the use of reasonable and ordinary care and prudence. The usual blasts of the whistle were sounded as the train came up and further than that it is almost incredible that a heavy train approaching, before its speed was slackened, at fifty or sixty miles an hour did not make noise enough in the quiet of the night in the country to have been heard by him if he had listened for it with proper caution.   Whether he loitered upon the crossing after he passed out of sight of the witness, Sykes, or whether the condition in which his free indulgence in beer left him so blunted and confused his senses as to deprive him of the ability to exercise that measure of care which his situation demanded, cannot now be told and must remain a matter of speculation.   The appellees, not having been able to produce any explanation for his failure to avoid the train when by the exercise of proper care he might have seen or heard it in time to save himself, they cannot recover for any injury they may have sustained from his death.  If he had survived he would have been unable to recover under these circumstances for any injury caused by this collision and as their right is, under the statute, no greater than his they suffer from the same disability.

The record does not in our opinion furnish legally sufficient evidence of any negligence of the appellant directly contributing to the collision by which Roming lost his life, but if it did contain such evidence it is apparent from all of the facts of the case that he is chargeable with contributory negligence of such character as to preclude the right of the appellees to recover in this suit.   The defendant's first and second prayers should have been granted and for the error of the Circuit Court in rejecting them the judgment appealed from must be reversed ; and as it is apparent that the appellees are not entitled to recover no new trial will be awarded.

*Judgment reversed with costs without awarding a new trial.*

(Decided December 3rd, 1902.)