STATE OF MARYLAND, FOR THE USE OF FANNIE R. CHAIRS ET AL., *v.* NORFOLK AND WESTERN RAILWAY COMPANY.

*Accident at Railroad Crossing—Switching Cars—Presence of Watchman—Absence of Air Brakes—Questions for Jury —Contributory Negligence—Of Automobile Occu-pants—Driver and Guest— Degree of Care—Instructions.*

In an action for the death of one in an automobile which, while crossing defendant's siding at night, was struck by the first of a long draft of freight cars pushed by an engine, there being a conflict in the evidence whether there was any signal, or a watchman at the crossing, or lights, the question of defend-ant's negligence was for the jury.                    pp. 685, 686

The testimony of the driver that, although listening for a signal when about to cross defendant's railroad siding, he heard none, was affirmative testimony from which the jury might find that the whistle, claimed to have been blown fourteen hundred feet away, was not blown or was not heard.                    p. 686

Testimony by the driver of an automobile that, when about to cross defendant's siding at night, the occupants, although looking and listening, did not see or hear a draft of freight cars starting to move slowly from within a short distance of the crossing, was not so inherently incredible as to be unworthy of consideration, the first of the approaching cars carrying no light, and the engine pushing them being distant and invisible.
                    pp. 686, 687

There being a conflict of testimony as to the presence of a watchman at the crossing, and as to any warning signal to travelers on the highway by such a watchman, these were questions for the jury.                                    p. 687

The negligence of the driver of an automobile, to whom the automobile had been loaned, was not imputable to the other occupant, on the theory that they were joint adventurers in a common enterprise, merely because such other requested the driver to take him to certain places, pointed out the direction, and indicated the dangers on the way, which was unknown to the driver.                                    p. 688

One driving across a railroad crossing is not under a duty to exercise "the highest degree of care and skill practicable under all circumstances," and it is error to instruct the jury that he is under such a duty.                              pp. 688, 689

In an action for the death of an occupant of an automobile at the crossing of a railroad siding at night, *held* that plaintiff's prayer, which was abstract in form, and did not require the jury to find that the injury was caused by defendant's negligent failure to give a crossing signal, while the deceased was exercising due care, was properly rejected.          p. 689

In an action for the death of an occupant of an automobile which, while crossing defendant's siding, was struck by the first of a draft of freight cars pushed by an engine, evidence as to whether the cars were equipped with air brakes was admissible on behalf of plaintiff.                              p. 689

In an action on account of a railroad crossing accident, the erroneous exclusion of evidence as to whether the cars which caused the accident were equipped with air brakes *held* not prejudicial to plaintiff, in view of evidence given which tended to show that the cars were equipped only with hand brakes.
                                            p. 689

*Decided January 11th, 1927.*

Appeal from the Circuit Court for Washington County (WAGAMAN, J.).

Action by the State of Maryland, for the use of Fannie R. Chairs, and others, the widow and minor children of Frank

H. Chairs, deceased, against the Norfolk and Western Railway Company. From a judgment for defendant, plaintiffs appeal. Reversed.

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Parke, JJ.

*Alexander Armstrong* and *Bernard J. Flynn,* for the appellants.

*Samuel B. Loose* and *William P. Lane, Jr.,* for the appellee.

Parke, J., delivered the opinion of the Court.

Isaac Rittinger was the owner of a five-passenger Studebaker automobile, and James G. Spahn, a friend, on the afternoon of December 24th, 1923, drove the owner and his wife to Hagerstown, where they went to spend Christmas with the owner's daughter, the wife of Frank H. Chairs. It was planned that, after spending Christmas day in Hagerstown, Spahn would go alone with the automobile to Frederick to visit and, on his return, take the owner and his wife back to their home in Baltimore. The party arrived in Hagerstown, went to the home of Frank H. Chairs, and Spahn remained there until about ten o'clock at night, when Spahn, at the request of Chairs, drove the latter and himself to a store to make some purchases, which had been overlooked by Mrs. Chairs. On their way back, Chairs suggested to Spahn that they drive to Williamsport for a ride. They accordingly proceeded over the railway crossing of the appellee at Virginia Avenue in Hagerstown and, after staying a few minutes in Williamsport, the two started on their return. Spahn continued to drive and, being unfamiliar with the route, requested Chairs, who sat on the right front seat, to direct him and to tell him when they approached the railway crossings. The first crossing which they met was that of the Cumberland Valley Railway, and Chairs warned the driver before it was reached. Appellee's crossing came next, and it was there that a collision occurred between the automobile

and the end of a string of thirty-two freight cars, which were being slowly pushed out upon the crossing.

The appellee's railway crossing was at grade and consisted of the single main line track and a siding to its south. The tracks were laid diagonally across the highway, which was fifty-five feet wide, including the sidewalks, and its macadam surface for public travel was about thirty-nine feet wide. Both tracks extend from the west boundary line of the crossing in a straight line for about three hundred feet and then curve slightly to the left. As you approach the railway crossing from Williamsport, which is south of the crossing, the course of the highway is a direct line for about six hundred feet before reaching the crossing. The view to the left or west of the highway as you near the crossing is unobstructed, except for a two-story brick dwelling and a few small trees which are about seventy-five feet south of the crossing and on the west side of the highway. The testimony is that on the crossing the tracks are visible in daylight for about one thousand feet; and that for a distance of one hundred feet, measured south from the crossing along the highway, there is an unbroken view of the tracks to the west for from nine hundred to one thousand feet; and that, at a distance of one hundred and fifty feet, the view of the tracks in the same direction is from twelve hundred to thirteen hundred feet, but that, at a distance of two hundred feet from the crossing, a similar view is afforded for two hundred and fifty feet. Hence, with an adequate unobstructed view of the tracks to the west from this last named point, there was no occasion to stop as well as to look and listen before attempting to pass over the crossing.

On the west of the highway, and a short distance south of the tracks, there was the usual railway danger signal post, but the crossing was without street or other light; and the railway company relied upon the signals given by an approaching train and by the crossing watchman to warn travelers by day and at night. The watchman was sheltered by a watchman's box built near the tracks, and he was equipped at night with a red lantern, which was so made that a red

light could be seen from the front and back faces of the lantern, but not from its two purposely darkened sides. The effect of this was to make the red light visible in but two and opposite directions, and the reason for the use of this type of lantern was to assure that the signal would not be observed by the trainmen when it was being used to warn the travelers on the highway.

The length of the draft of the freight cars which came in collision with the automobile was about twelve hundred feet, and, as the pushing locomotive was on the curve in a cut, the engineer could not, at this distance, see the end of the draft or directly receive a signal from his brakeman at the other end, but regulated the movement of his train by signals relayed through brakemen at both ends, and in the middle, of the draft. The nearer end of the draft was estimated to be from one hundred and fifty to two hundred feet west of the crossing, and the movement of these freight cars was a yard or shifting operation, which began by the engineman blowing his whistle, when he started to push the draft over the crossing, so as to let the crew and the crossing watchman know the beginning of the propulsion of the draft over the highway crossing. According to the testimony on the part of the appellee, as soon as the engineman gave his whistle, the watchman took his place at the middle of the street crossing, between the main track and the siding track, and swung his lantern to give warning to the travelers on the highway. While the watchman was so engaged, the automobile occupied by Spahn and Chairs approached the crossing at a rapid speed without stopping, and the draft, as soon as it passed between the watchman and the automobile, prevented either the watchman seeing the automobile or its occupants observing the watchman and his signal. The driver, perceiving in his path, and too late to stop, the freight car, which was slowly moving over the crossing at a rate variously given as four, five and six miles an hour, turned, in his attempt to escape, the automobile sharply to the right and drove off the metaled highway, but not soon enough to avoid being struck

by the first freight car, which collided with the automobile and dragged it until, in response to a signal from the front brakeman, which was relayed through ·the intermediate brakeman to the engineer, the draft was brought to a stop after it had traveled almost four freight car lengths east of the crossing. The driver was thrown from the automobile and was found, injured, lying on the. south of the switch and about seventy feet east of the crossing. The dead body of Chairs was among the wreckage of the automobile, which had been swept along and crumpled under the first freight car. The other evidence of the appellee tended to support its theory that the watchman was on the crossing in time, and, with the red light of his lantern displayed to the travelers on the highway, did signal long enough before the car reached the crossing for the driver to have stopped in a place of safety, and that the occupants of the automobile had seen the signal, but either disregarded it or had not looked until too late to avert the accident.

The important testimony on the part of the appellant was that given by the driver of the automobile. His evidence with respect to the accident tended to show that Chairs told him of the first railway crossing on their way into Hagerstown, and that he slowed down and looked ahead and to the right and to the left before he drove over, and that at a curve in the highway, which the proof on the part of the appellee established was six hundred feet before the crossing of the appellee would be passed, Chairs again warned him of the railway crossing where the collision occurred, and asked him to slow down. In response to this warning and direction, the driver gradually reduced his speed from fifteen miles an hour to six or eight miles an hour, and about one hundred feet from the crossing he disengaged his clutch and let his automobile drift forward, meanwhile listening attentively and looking ahead and to the right and left until the railway crossing was reached, where, not having heard, nor hearing, anything to warn him of the oncoming freight cars, and not having seen, nor seeing, the cars, or any light or watchman,

the automobile drifted, without stopping, upon the railway crossing, being kept on the right side of the highway. The automobile had its front wheels about on the siding when its driver heard a shout on his left. He turned his head, saw, at the edge of the macadam of the highway, the approaching freight car and some one on it with a light, and immediately engaged his clutch, and did all in his power to escape, turning to the extreme right of the roadway, but before the driver could get off the siding the automobile was struck on the left, near the rear seat, and overturned, and then the driver lost all recollection of what happened until he was picked up on the south of the siding.

The driver of the automobile further testified that Chairs warned him some six hundred feet away of the railway crossing in question, and the appellee, in the production of its evidence, proved an admission by the driver, containing the statement that his companion had notified him of the nearness of the crossing. It must be accepted, therefore, as a fact established by this record, that Chairs gave the driver due notice of the presence of the crossing. It is also the testimony of the driver that Chairs suggested the speed of the automobile be lessened, and that this was done in the manner described. The driver further stated that he knew from his companion's movements that he was also looking and listening as they traveled towards the crossing, but that neither of them spoke. The automobile was in good running condition, with its headlights burning and, at its rate of speed while advancing towards the crossing, could have been stopped within its own length.

If the testimony on the part of the appellant be true, it tended to establish that, with no obstruction between the automobile and the railway track, with no signal, watchman, nor anything else seen or heard to indicate to Chairs the approach of the freight train, or the probable failure of the driver to continue, until the passage of the crossing was accomplished, to exercise the same degree of adequate care as he was then exhibiting, the automobile under control and

moving slowly forward was suddenly struck on the crossing by the unlighted end of a string of freight cars, unexpectedly emerging from the darkness of the night at the edge of the macadam highway, and advancing too rapidly for the driver of the automobile to avoid the collision. This testimony tending to show the culpability of the appellee and the absence of fault on the part of Spahn and of Chairs was in conflict with the evidence offered by the appellee, but the relative credibility and weight of the evidence was for the jury and not for the court, unless the testimony for appellant is so clearly false that it must be rejected in the consideration of this case.

The accident occurred late at night, the crossing had no street light, and the string of unlighted freight cars on the siding track was motionless in the darkness. The pushing engine was around a curve and hidden from view in a cut about fourteen hundred feet west of the highway crossing, and the other end of the draft of freight cars was, as appellee's watchman first testified in chief, within fifty or sixty feet of the crossing, but later, on his cross-examination, he asserted the distance was from one hundred and fifty feet to two hundred feet, which is the estimate of the other witnesses on the part of the appellee. In any event, the distance to be traversed before the first freight car reached the crossing was short. The only signal which the appellee asserts was given by the engine was a whistle blown at the beginning of the movement of the freight cars towards the crossing. This was not blown to warn travelers on the highway, but to notify the watchman in his box to take his station at the crossing to protect the public. The testimony of the driver that he, although listening for a signal, heard none, is affirmative testimony from which the jury might have found the distant whistle was either not given or was not heard. *Balto. & O. R. Co. v. State,* 141 Md. 523. Moreover, the movement was not that of a running train out in the silence of open country, but a slow movement of a draft of freight cars on a siding track connected with the railway yards of Hagerstown, that had begun, under the propulsion of a distant and invisible engine, only a few minutes before the acci-

dent. The foremost freight car carried no warning light and, according to the appellant's proof, did not leave the obscurity of the night by entering upon the crossing until the front part of the automobile was upon the track of the siding. Under the circumstances it cannot be said that the testimony of the driver to the effect that, although looking and listening, the occupants of the automobile had not seen nor heard the approach of the freight cars during the few feet it had been in motion before it come on the crossing was so inherently incredible as to be unworthy of consideration. The driver saw the car as soon as it was visible, according to his testimony, and nothing the other occupant of the automobile could have done would have been helpful in such an imminent peril. Nor do the facts warrant disregarding the testimony that those in the automobile were not warned by the crossing watchman. It was possible for the watchman not to have been at his post; and for the warning signal from his lantern not to have been given because of this absence, or because the covered or dark sides of his lantern were turned towards the travelers on the highway, and the illuminated sides were held so as to shine up and down the railway tracks. The presence of the watchman at his station in time to give warning to the occupants of the automobile was not an inevitably accompanying circumstance of the accident, but was an independent fact to be established by proof. The witnesses for the appellee testified that they looked and saw him there signaling travelers to stop; but the witness for the appellant was as positive and direct in his testimony that the occupants of the automobile also looked, but saw neither the watchman nor his signal. It clearly was for the jury to weigh this conflicting evidence and to determine the issue of fact it raised; and, therefore, the appellee was not justified in its contention that the judgment of the lower court should be affirmed on the ground that the appellant had sustained no injury because appellee's prayers demurring to the legal sufficiency of the evidence to entitle the appellant to a recovery should have been granted. *Balto. & O. R. R. Co. v. McCabe,* 133 Md. 219, 224, 225.

2.    The next matter for determination is presented by the ruling on the prayers. The rejection of the appellant's first, fourth and fifth prayers, and the granting of appellant's seventh prayer as modified by the court, and of appellee's ninth and thirteenth prayers, were due to the acceptance by the *nisi prius* court of appellee's theory that the negligence of the driver was imputable to the other occupant of the automobile. The evidence established that Chairs was neither the master nor the principal of the driver of the automobile. The driver who had possession and control of the automobile was the bailee of its owner; and Chairs was the guest or passenger of the bailee. That Chairs requested the bailee to drive him, first, to the shopping district and then to Williamsport, and pointed out the direction and indicated the dangers to be encountered to a chauffeur, who did not know the way, in no legal manner made the two joint adventurers in a common enterprise. The guest was riding at the pleasure of the driver, who was under no obligation or duty to obey the directions of Chairs with respect to where the driver should take or return the automobile, or in what manner it should be used and operated. In no true sense can it be said that they had joint or common possession and control of the automobile. *Phila. etc. Ry. Co. v. Hogeland,* 66 Md. 149; *Balto. & O. R. Co. v. McCabe,* 133 Md. 219, 224; *Baltimore v. State,* 146 Md. 440, 450, 451; *Dorchester County v. Wright,* 138 Md. 580; *Wash., B. & A. Ry. Co. v. State,* 136 Md. 103, 109. It follows that the lower court was in error when it laid down the proposition that the negligence of the driver was imputable to his guest, under the circumstances disclosed by this record, and that, therefore, it should not have granted the appellee's ninth and thirteenth prayers, nor should it have modified the appellant's seventh prayer, which, together with appellant's first, fourth, and fifth prayers, should have been granted, as these were instructions of an accepted form and adapted to the facts of the instant case. It may also be added that appellee's ninth prayer was erroneous in imposing upon the driver the duty to exercise "the highest degree of care and skill practicable under all circum-

stances." It is true that this expression is found in a prayer approved in *United Rwys. & Elec. Co. v. Crain,* 123 Md. 332, 338, 339, 354, but the opinion did not expressly consider the phrase, which under the circumstances sets too high a degree of care, as was explained in *Wash., B. & A. R. Co. v. State,* 136 Md. 103, 117.

There was no error in rejecting appellant's third prayer, as it was abstract in form and did not require the jury to find as a condition of recovery that the injury complained of was caused by the negligent failure to give the crossing signal while the dead man was in the exercise of due care. The eighth prayer on the part of the appellant was rightly refused. It sought to hold the appellee responsible upon the theory that the servants of the appellee could have discovered the peril of the travelers on the crossing and then have stopped the engine and cars so as to have prevented the collision. There was no legally sufficient evidence to support the submission of this prayer. The fourth prayer of the appellee was a customary instruction on the burden of proof, and the appellee's fifth prayer as modified was unobjectionable.

3. The four exceptions on the evidence arise on the refusal of the trial court to permit witnesses to testify with respect to the equipment of the cars with air brakes. We think evidence was given tending to show that the cars were provided with only hand brakes, and this would prevent error from being prejudicial; but, as the case must be sent back for a new trial, it may be said that this evidence was admissible as reflecting upon how the movement of the freight cars was controlled.

Because of the indicated error in the rulings on the prayers, the judgment will have to be reversed for a new trial.

*Judgment reversed, with costs, and case remanded for a new trial.*