# WESTERN MARYLAND RAILWAY COMPANY
## *v.* WILLIAM A. MYERS.
[No. 37, October Term, 1932.]

*Decided January 10th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Alexander Armstrong* and *Paul S. Parsons,* with whom was *Milton G. Urner, Jr.,* on the brief, for the appellant.

*Leslie N. Coblentz,* with whom were *Bruce C. Lightner* and *Amos A. Holter* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The appellee, plaintiff below, recovered a judgment against the appellant for damages from personal injuries alleged to have been sustained in a collision, at a grade crossing in Hagerstown, between a locomotive and an automobile in which the plaintiff was riding. Negligence on the part of the defendant causing the collision was the ground of recovery, and the trial court's refusal to direct a verdict for the defendant because of lack of legally sufficient evidence to prove the negligence is the chief subject of contention in this court. Review is sought, too, of rulings on other prayers for instructions to the jury.

The crossing was that of Potomac Avenue in Hagerstown, a highway running in northerly and southerly directions; and there are two main railroad tracks extending across the street, for eastbound and westbound traffic respectively, and a third track for a siding gradually curving away from the other two on the southerly side. On the night of December 19th, 1930, the plaintiff, with two other young men, Burger and Weibel, drove up to the crossing from the south in a small, single-seated automobile, owned and driven by Burger. The automobile was one with an open body, and all its curtains were attached to close the

occupants in from the cold. They intended to stop on the other, or northern, side of the crossing to let out Myers, the plaintiff, to go to his home in the second house beyond. Burger, the driver, who was familiar with the crossing, testified that he put on his brakes lightly as he approached it, and reduced his speed to a rate of about ten or eleven miles an hour when he was twenty or twenty-five feet south of the siding, which was the track nearest him. At that time the locomotive was nearing the crossing, backing, on the westbound track, the one farthest from the oncoming automobile. It was therefore moving from Burger's right toward his left. Other automobiles crossed before the locomotive reached the crossing, and one other, coming from the north, stopped to await the passing of the locomotive. The driver of this automobile last mentioned estimated the speed of the locomotive at about that of a man walking, while other witnesses estimated it at from six to ten miles an hour.

A vacant lot of ground lies to the east and south of the tracks, or on the right of Burger's approaching automobile, and affords a view over the tracks to the east, unbroken except for the interference of cars that may be on the siding; and on this night there was a box car standing on the siding about ten or fifteen feet from the edge of the street, to the right of the automobile. On the left-hand side of the street, opposite to the position of the box car, a city light was suspended on an arm extending out from a high pole, but witnesses for the plaintiff testified that its light did not shine across so as to make objects beyond the street on the other side visible. A crossing signal bell stands on the northerly side of the three tracks, and there was a bell on the locomotive, and a light of the ordinary headlight type mounted on the rear of its tender, arranged to focus its beam on the track far ahead, but showing a dimmer light nearby, and on the sides. Burger testified that before he crossed he looked toward the tracks on his right, but saw nothing at all; nothing but darkness. He said he did not see any engine light, though he looked, and did not hear the crossing bell, or bell

on the engine, though he listened. He did not stop or open his curtains to look and listen, but said his curtains and his motion did not interfere with his seeing and hearing. Weibel, in the automobile with him, and with the plaintiff, said he too failed to see any light from the engine, or to hear any bell. Both of these witnesses added, however, that they did not know whether the bells were ringing or not, and the plaintiff himself adduced the evidence of two witnesses, Kinch, the driver of the automobile coming from the north and which stopped at the tracks, and a Mrs. Ritz, who lived beside the track nearby, to the effect that both bells were ringing as the locomotive crossed, and that the light on the tender was showing, but seemed dim. Kinch testified that he saw the headlight when it was sixty or eighty feet from the crossing, and that it was the light that made him stop. He did not hear the crossing bell until he put his windows down, and he distinctly recalled having heard it then. Myers testified that he retained no recollection of events leading up to the collision. Witnesses called by the defendant testified that all signals were given, but that Burger's automobile was driven rapidly over the crossing in disregard of the danger.

On behalf of the plaintiff it is contended that, from the testimony of Burger and Weibel, that they failed to hear the signal bells or see the engine light, it was permissible for a jury to find that these several signals were negligently omitted; and reference is made to decisions that failure of one looking and listening to perceive such signals affords affirmative evidence that none were given. *State, use of Chairs, v. Norfolk & Western Ry, Co.,* 151 Md. 679, 686, 135 A. 827; *State, use of Pachmayr, v. Balto. & O. R. Co.,* 157 Md. 256, 261, 145 A. 611. But the situation presented by the evidence recited here differs materially from that supposed in this argument, and that found in the cases referred to. Here the failure of the two witnesses of the plaintiff to hear the bell signals did not, according to their statements, indicate to them that the signals were not sounded. Although they knew the circumstances and the possibilities

better than a jury could know them, they expressed themselves as unable to draw the inference which the plaintiff would have the jury draw from their statements at second hand. And in addition to that, the plaintiff produced direct evidence that the signals were in fact given, both by light and by bells. Drawing from that state of evidence an inference that the signals were not given would seem to be a contradiction of its meaning and effect, a contradiction rather than an inference, and a finding in the evidence of something that it does not contain. In *Klein v. United Rwys. & Elec. Co.,* 152 Md. 492, 503, 137 A. 306, 310, the court said of similar testimony: "In the face of the positive and direct evidence of her own witnesses, as well as those of the defendant to the contrary, it is incredible that Mrs. Klein meant by her testimony to go any further than to say that she had heard no whistle until the impact, and that was probably true. * * * Under such circumstances, the rule stated in *Balto. & O. R. Co. v. Roming,* 96 Md. 67, 53 A. 672, applies rather than that stated in *United Rwys. Co. v. Crain,* 123 Md. 332, 339, 91 A. 405." And the case on this point seems similar to that stated in *Foley v. N. Y. Central & H. R. R. Co.,* 197 N. Y. 430, 90 N. E. 1116, 1117, quoted in the *Crain* case: "Thus each witness at the close of his examination made it appear that his failure to hear the bell ring did not occur under such circumstances as to fairly indicate that it did not * * * ring." This court is therefore of the opinion that, in consideration of the questions now raised, it must be regarded as established that, as the locomotive approached and came to the crossing, its light was showing, and its bell was ringing, and the crossing bell was ringing. There was no testimony that the bells were sounded with any less strength than that with which such bells are ordinarily sounded. We understand it to be undisputed that the blowing of the locomotive whistle was forbidden by city ordinance. It is not contended that the whistle should have been blown.

On the whole, it could not be deduced from the evidence that there was any omission of the signals ordinarily given

at railroad crossings and ordinarily found sufficient. And if this is true, then there remains to be considered only an argument that these ordinary warnings could be found to have fallen short of the requirement of reasonable care, because of the presence of the box car on the siding and possible obstruction of the view by it of drivers on the street. The circumstances of the particular case must determine the requirements of reasonable care, and while the defendant company could not be charged with negligence in leaving a car standing anywhere on its private right of way, as is conceded, still, any possibility of obstruction of view by the car is to be considered as one of the circumstances contributing to determine the care required, just as would a building standing in the same situation. *Phila., W. & B. R. Co. v. Hogeland*, 66 Md. 149, 160, 7 A. 105; *Elliott, Railroads* (3rd Ed.), secs. 1656 and 1667; note, 47 A. L. R. 287. And the requirement of care is to be determined also by considering what the engineer of a locomotive would be justified in counting upon from travelers on the highway approaching the crossing.

That the box car shut off Burger's view of the tracks, and caused him to drive across on the assumption that his way was clear, is, in the first place, a supposition not based on any definite evidence and seemingly in conflict with some of Burger's own testimony. He said he did not see the box car at all at or before the time of the accident, denied having said at a previous trial that box or freight cars blocked his view, and testified that, after he got close to the siding, he was able to look down to the right, down the tracks, yet failed to see the engine coming. Those statements, not contradicted or qualified in any other evidence, would seem to prevent our treating the presence of the box car as a factor in the case. But if it could be so treated, then it would have to be considered that the car in this instance could obstruct the view of only a small part of the whole extent of tracks in sight; the lot of ground adjacent to the railroad property afforded automobile drivers approaching from the south a view over a large extent of tracks to the right, so far as darkness would

permit a view, and, of course, on reaching the siding the drivers would have an unobstructed view, as stated. A locomotive, moving even so slowly as that concerned in this case, could, as it passed along, be shut out from view by the box car during only a second or two, and it would not be shut out at all from the view of drivers who approached so far as the siding. From that point the locomotive would be in view while the automobile would be driving across the siding, over the space separating it from the main tracks, and over the east-bound track, before a collision could occur. In that situation, the engine crew here was showing its light and sounding its bell, and the crossing bell was sounding. What additional warnings the defendant might have provided is not definitely suggested. It is not suggested that gates or a flagman should have been in use there, or that the standing box car should have been lighted. *Penna. R. Co. v. Yingling,* 148 Md. 169, 176, 129 A. 36. The locomotive could not be required to stop at a crossing to allow automobiles to pass; if necessary in order to guard against collision, the automobiles must stop. *Elliott, Railroads* (3rd Ed.), sec. 1443, 1662 and 1663. *Phila., W. & B. R. Co. v. Hogeland, supra,* pages 160, 161 of 66 Md., 7 A. 105. With the signals given as described, it would seem that an engineer moving slowly toward the crossing might safely count upon travelers perceiving by sight and hearing that the locomotive was approaching, and avoiding collision with it; and the facts suggest that Burger's failure to see and hear may have been due rather to the obstruction of his curtains and interference of the sound of his running automobile.

In the opinion of this court, the evidence would not permit a finding that the duty of reasonable care on the defendant's part required any additional precautions, and we come to the conclusion that there was error in the refusal to direct a verdict for the defendant for want of the requisite proof of negligence on its part.

*Judgment reversed without a new trial, with costs to the appellant.*